Justice DURHAM,
opinion of the Court:
INTRODUCTION
{1 Appellants brought suit to enjoin the enforcement of a law, claiming that the law violated the state constitution in four respects. The district court dismissed the first two claims and rejected the second two claims on summary judgment. On appeal, we consider whether Appellants had standing to bring these claims in the first place. We hold that, although they lacked the personal injury required for traditional standing, Appellants had public-interest standing to bring the first two claims. We also hold that they did not have standing to bring the second two claims under either the traditional or the public-interest doctrine of standing, and we accordingly vacate the grant of summary judgment on those claims and remand to the district court for dismissal. Finally, we hold that although Appellants had standing to bring the first two claims, the district court properly dismissed the claims under Utah Rules of Civil Procedure, rule 12(b)(6).
BACKGROUND
2 In March 2008, the legislature enacted Senate Bill 2 (the Bill). The Bill contained some fourteen items relating to education, establishing new programs and amending existing programs; it also contained funding provisions for some programs.
T3 Appellants are a group of current and former legislators, other elected and unelected government officials, and self-described "good citizens." They include current and former members of the Utah State Board of Education (the Board). However, they appear in their individual capacities, and the Board itself is not a party to this litigation. In May 2008, Appellants filed suit in district court against the State's Attorney General, its Treasurer, and the Executive Director of the Department of Human Resources (collectively, Appellees), seeking a declaration that the Bill was unconstitutional and an injunetion against its implementation, as well as an award of costs and fees.
1 4 Appellants claimed the Bill was unconstitutional in four respects. The first two claims fall under Article VI, Section 22 of the Utah Constitution, which provides that "no bill shall be passed containing more than one subject, which shall be clearly expressed in its title." (Emphasis added.) Appellants argue that the Bill as a whole violates this provision in two respects: first, they argue that it contained "more than one subject"; second, that its subject was not "clearly expressed in its title" (collectively, the Article VI Claims). The second two claims fall under Article X, Section 8 of the Utah Constitution, which provides that "[the general control and supervision of the public education system shall be vested in a State Board of Education." Appellants argue that two items of the Bill violate this provision: first, the item that delegates the administration of the Teacher Salary Supplement Program to the Department of Human Resources; see-ond, the item that delegates textbook approval to private entities (collectively, the Article X Claims).
1 5 Appellees moved to dismiss the Article VI Claims pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. They subsequently moved to dismiss the Article X Claims for lack of standing and moved in the alternative for partial summary judgment on those claims. The district court granted Ap-pellees' motion to dismiss the Article VI Claims for failure to state a claim, and later granted the State's motion for summary judgment on the Article X Claims. It did not rule on the alternative motion to dismiss those claims for lack of standing.
*1102 T6 Appellants timely appealed.[1] We permitted the Office of Legislative Research and General Counsel of the Utah Legislature to appear as amicus curiae.[2] At oral argument, we asked the parties to discuss whether Appellants had standing to bring any of their claims. We then ordered supplemental briefing on the standing question in regard to the Article X Claims.
7 We have jurisdiction under Utah Code section 78A-3-1028)().
STANDARD OF REVIEW
18 "We review the grant of a motion to dismiss for correctness, granting no deference to the decision of the district court." State v. Apotex Corp., 2012 UT 36, ¶ 16, 282 P.3d 66 (internal quotation marks omitted). Further, "[o}n appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." Id. 13 (internal quotation marks omitted).
ANALYSIS
T9 Since standing is a jurisdictional requirement, we first must determine whether Appellants have standing to bring any of their claims. Unlike in the federal system, our law recognizes that appropriate plaintiffs without individualized injury may nevertheless possess standing to bring certain claims treating issues of great public importance. We determine that the issues underlying the Article VI Claims rise to this level and that Appellants are appropriate parties to bring these claims; Appellants therefore have standing to raise the Article VI Claims. The issues underlying the Article X claims, however, do not rise to this level, and furthermore Appellants are not appropriately situated to bring them. Accordingly, they do not have standing to raise the Article X claims.
On the merits of the district court's dismissal of the Article VI Claims, we hold that even on the facts alleged by Appellants, the Bill does not violate either the single-subject or clear-title rules of Article VI, Seetion 22. Accordingly, the dismissal is affirmed.
I. STANDING
111 "[In Utah, as in the federal system, standing is a jurisdictional requirement." Brown v. Div. of Water Rights of the Dep't of Natural Res., 2010 UT 14, ¶ 12, 228 P.3d 747.[3] Furthermore, "[s]tanding is an issue that a court can raise sua sponte at any time." State v. Tuttle, 780 P.2d 1203, 1207 (Utah 1989).
A. Utah Recognizes Public-Interest Staond-ing in Matters of Great Constitutional or Public Importance
112 "Unlike the federal system, the judicial power of the state of Utah is not constitutionally restricted by the language of Article III of the United States Constitution requiring 'cases' and 'controversies,' since no similar requirement exists in the Utah Constitution." Jenkins v. Swan, 675 P.2d 1145, 1149 (Utah 1983).[4] While it is "the usual rule that one must be personally adversely affect *1103 ed before he has standing to prosecute an action .... it is also true this Court may grant standing where matters of great public interest and societal impact are concerned." Jenkins v. State, 585 P.2d 442, 443 (Utah 1978).[5]
118 "[Dlespite our recognition of this Court's power to grant standing where matters of great public interest and societal impact are concerned," however, "this Court will not readily relieve a plaintiff of the salu-tory requirement of showing a real and personal interest in the dispute." Jenkins v. Swan, 675 P.2d at 1150 (internal quotation marks omitted). Therefore,
we engage in a three-step inquiry in reviewing the question of a plaintiff's standing to sue. The first step in the inquiry will be directed to the traditional criteria of the plaintiff's personal stake in the controversy.... If the plaintiff does not have standing under the first step, we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff. If there is no one, and if the issue is unlikely to be raised at all if the plaintiff is denied standing, this Court will grant standing.... The Court will deny standing when a plaintiff does not satisfy the first requirement of the analysis and there are potential plaintiffs with a more direct interest in the issues who can more adequately litigate the issues. The third step in the analysis is to decide if the issues raised by the plaintiff are of sufficient public importance in and of themselves to grant him standing.
Id. (emphases added).[6]
*1104 T 14 In a more recent case, we summarized this alternative basis for standing as follows: "[The statutory and the traditional common law tests are not the only avenues to gain standing; Utah law also allows parties to gain standing if they can show that they are an appropriate party raising issues of significant public importance ...." Cedar Mountain Envtl., Inc. v. Tooele Cnty. ex rel. Tooele Cnty. Comm'n, 2009 UT 48, ¶ 8, 214 P.3d 95 (emphasis added).
15 In Jenkins v. Swan we framed the middle step of the "three-step inquiry" as "the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff," 675 P.2d at 1150. In Cedar Mountain, however, we modified the inquiry, requiring a determination of whether the plaintiff is "an appropriate party." 2009 UT 48, 18, 214 P.3d 95 (emphasis added). This shift in analysis is explained in intervening precedent. In 2006 we explained:
Under the alternative test, a petitioning party must first establish that it is an appropriate party to raise the issue in the dispute before the court. A party meets this burden by demonstrating that it has the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions and that the issues are unlikely to be raised if the party is denied standing. We recognize that there is language in both Jenkins [v. Swan] and subsequent cases suggesting that in making this determination the court may grant standing only to the party with the greatest interest in the case, or in other words, the most appropriate party. We now conclude, however, that the notion that a court must find the most appropriate party, thereby limiting standing under the alternative criteria to only one party in any given case, is unnecessary and counter-productive.... [A] court addressing standing under the alternative test does not need to determine which party seeking to intervene is the most appropriate party in comparison to any other potential party, but rather needs to determine only which parties are, in fact, appropriate parties to a full and fair litigation of the dispute in question.
[[Image here]]
In addition, an appropriate party must still satisfy the second part of the alternative test before we will grant standing. Once a party has established that it is an appropriate party to the litigation, it must also demonstrate that the issues it seeks to raise are of sufficient public importance in and of themselves to warrant granting the party standing.
Utah Chapter of the Sterra Club v. Utah Air Quality Bd., 2006 UT 74, ¶¶ 36, 39, 148 P.3d 960 (citations omitted) (internal quotation marks omitted).[7] Cedar Mountain's more concise statement of the test is the applicable standard: "[Plarties [may] gain standing if they can show that they are an appropriate *1105 party raising issues of significant public importance ...." 2009 UT 48, ¶ 8, 214 P.3d 95. This is a two-part inquiry. Id. 115 ("[T)his test breaks down to two elements: (1) is the plaintiff an appropriate party; and (2) does the dispute raise an issue of significant public importance." (citing Sterra Club, 2006 UT 74, ¶¶ 36-39, 148 P.3d 960)).[8]
€ 16 Our public-interest standing doctrine is not unusual in state jurisprudence. Numerous other states, mindful that their constitutions do not impose the same restrictions on their judicial power that the federal constitution imposes on federal courts,[9] have similarly established (under various names) a doctrine of public-interest standing.[10] Seq, e.g., Trustees for Alaska v. State, 736 P.2d 324, 329 (Alaska 1987) ("[Tlaxpayer-citizen status is a sufficient basis on which to challenge allegedly illegal government conduct on matters of significant public concern."); Save the Plastic Bag Coal. v. City of Manhattan Beach, 52 Cal.4th 155, 127 Cal.Rptr.3d 710, 254 P.3d 1005, 1011-12 (2011) ("[Where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the petitioner need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced We refer to this variety of standing as public interest standing." (alteration omitted) (internal quotation marks omitted)); State ex *1106 rel. Cittadine v. Ind. Dep't of Transp., 790 N.E.2d 978, 980 (Ind. 2003) ("Indiana cases recognize certain situations in which public rather than private rights are at issue and hold that the usual standards for establishing standing need not be met.... [Wlhen a case involves enforcement of a public rather than a private right the plaintiff need not have a special interest in the matter nor be a public official." (internal quotation marks omitted)); Godfrey v. State, 752 N.W.2d 413, 425 (Iowa 2008) ("We believe our doctrine of standing in Towa is not so rigid that an exception to the injury requirement could not be recognized for citizens who seek to resolve certain questions of great public importance and interest in our system of government."); New Energy Econ., Inc. v. Martines, 149 N.M. 207, 247 P.3d 286, 290 (2011) ("We do not need to decide whether Petitioners have an actual beneficial interest because we conclude that they have standing under the great public importance doctrine. This court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance." (alteration omitted) (internal quotation marks omitted)); State ex rel. Ohio Acad. of Trial Lawyers v. Sheward, 86 Ohio St.3d 451, 715 N.E.2d 1062, 1082 (1999) ("This court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties.").
117 The case of Michigan is particularly illuminating. Recently, the Supreme Court of that state overruled a line of cases which "departed dramatically from Michigan's historical approach to standing." Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ., 487 Mich. 349, 792 N.W.2d 686, 689 (2010); see generally Kenneth Charette, Standing Alone?: The Michigan Supreme Court, the Lansing Decision, and the Liberalization of the Standing Doctrine, 116 PEnn St. L. Rav. 199 (2011). In restoring Michigan's traditional approach to standing, the Lonsing court explained that "[tJhere is no support in either the text of the Michigan Constitution or in Michigan jurisprudence ... for recognizing standing as a constitutional requirement or for adopting the federal standing doctrine." 792 N.W.2d at 698. The same is true of Utah's constitution and jurisprudence.[11]
18 We reaffirm today the teaching of our precedent that "Utah law ... allows parties to gain standing if they can show that they are an appropriate party raising issues of significant importance." Cedar Mountain, 2009 UT 48, ¶ 8, 214 P.3d 95.
B. Appellants Do Not Meet the Traditional Standing Criteria of Having a "Personal Stake in the Controversy" for Any of Their Four Claims
119 As explained above, Appellees below moved to dismiss the Article X Claims for lack of standing. The district court, however, granted Appellees' alternative motion for summary judgment on those claims without ever ruling on the question of standing. Appellees had earlier moved to dismiss the Article VI Claims for failure to state a claim pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. Although that rule may be used to dismiss a claim for lack of standing, see Anderson v. Dean Witter Reynolds, Inc., 920 P.2d 575, 577 (Utah Ct.App. 1996), Ap-pellees invoked it only to assert that Appellants had failed to state a cause of action. The district court therefore never considered *1107 whether Appellants had standing with respect to any of their claims.
120 As mentioned above, however, this court may raise standing "sua sponte at any time." Tuttle, 780 P.2d at 1207. We did so at oral argument, and then requested supplemental briefing on standing with respect to the Article X Claims. The arguments submitted by the parties in their supplemental briefs, however, are applicable to all four claims. For the following reasons, we determine that Appellants do not have traditional standing to raise any of their claims.
4] 21 Appellants argue that they have traditional standing to bring the Article X Claims for two reasons. First, they argue that the challenged provisions of the Bill deny "plaintiffs as voters ... their political prerogative, implicit in Article 10, Section 3, to hold Board members politically accountable by a meaningful exercise of the right to vote." This argument is not persuasive. To the extent that one's status as a voter in itself ever gives one a right to challenge legislation, it can only be through some form of an alternative form of standing, such as our public-interest doctrine. It does not constitute a "personal stake in [a] controversy." Jenkins v. Swan, 675 P.2d at 1150.
{22 Appellants' second argument is that they have traditional standing to bring the Article X Claims because six of them are members of the Board.[12] They argue that the Salary Supplement Program and the Textbook Approval Program "positively forbid the members of [the Board] from exercising their Article 10, Section 3 powers respecting those programs .... mak[ing] it impossible for them to fulfill their oaths of office ... and impair[ing] their ability, as candidates, in seeking re-election to office." This argument is similarly unconvincing. Appellants cite no authority for the proposition that elected officials have a vested interest in reelection sufficient to satisfy the traditional test for standing. And while it is true that elected officials who take oaths of office should take those oaths seriously, they likewise cite no authority establishing that taking such an oath gives them standing to challenge a law which they assert will infringe on their ability to faithfully execute it. Appellants are, in essence, asking that we view those who were members of the Board at the time they brought suit as being localized attorneys general, charged with constitutional authority to prosecute alleged violations of their portion of the constitution. This we decline to do.
123 For similar reasons, we determine that Appellants lack standing to bring those claims under the traditional doctrine of standing. As explained below, we conclude that they do have public-interest standing to bring the Article VI Claims. But that is only because we determine that violations of the provisions at issue in those claims are of sufficient public importance that they give Appellants standing to raise such violations in their role as citizens.
1 24 In previous cases where this court has reviewed the merits of a claim that either or both the single-subject and clear-title rules of Article VI, Section 22 have been violated, the plaintiffs alleged a direct and personal injury sufficient to satisfy the traditional standing test. See, eg., State v. Barlow, 107 Utah 292, 153 P.2d 647, 655 (1944) (persons con-vieted under a law criminalizing polygamous lifestyle alleging "that the statute actually contains four subjects"); Pass v. Kanell, 98 Utah 511, 100 P.2d 972, 973, 975 (1940) (renter and owner of car found liable for tort challenging statutory basis for lability as violating both the single-subject and the clear-title rules); State v. Edwards, 34 Utah 13, 95 P. 367, 368 (1908) (court reporter alleging that a law which "affect[ed] his salary" violated the single-subject rule). While we determine below that the Article VI Claims treat issues of public significance and that Appellants are appropriately situated to *1108 bring them, comparison with the cases cited above clarifies that Appellants have standing to bring those claims only under the alternative public-interest doctrine. They do not have a "personal stake in the controversy." Jenkins v. Swan, 675 P.2d at 1150.[13]
C. The Article VI Claims Rise to the Level of Great Constitutional Importance, and Appellants are Appropriately Situated to Raise Them
$25 As explained above, Appellants do not meet the traditional requirements for standing on any of their four claims. We therefore consider whether they meet the requirements for public-interest standing. First, we examine their Article VI Claims, and determine that they do meet those requirements.
126 Article VI, Section 22 of the Utah Constitution provides: "Except general appropriation bills and bills for the codification and general revision of laws, no bill shall be passed containing more than one subject, which shall be clearly expressed in its title." These provisions, we have observed, "reflect[ ] an intent to limit legislative power and prevent special interest abuse" and are "clearly motivated by a wariness of unlimited legislative power." Laney v. Fairview City, 2002 UT 79, ¶ 34, 57 P.3d 1007.
127 The restrictions placed on legislative activity by Article VI, Section 22 of the Utah Constitution are part of the fundamental structure of legislative power articulated in our constitution. They are accordingly of sufficient importance and general interest that claims of their violation may be brought even by plaintiffs who lack standing under the traditional criteria.[14] Not every constitutional provision, to be sure, is of such importance that a claim of its violation will necessarily rise to the level of "significant public importance" required for public-interest standing under the formulation of Cedar Mountain, 2009 UT 48, ¶ 8, 214 P.3d 95. Our discussion below reveals, for instance, that delegations of particular functions to specific *1109 executive agencies may not rise to that level. But today we hold that the single-subject and clear-title rules of Article VI, Section 22 do.
$28 Under Cedar Mountain, the importance of the issue by itself is not enough to give parties public-interest standing. One must also be "an appropriate party." Id.; see also id. T 15 (emphasizing that "this test breaks down to two elements"). "[AJn appropriate party .... has the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions ...." Sierra Club, 2006 UT 74, 136, 148 P.3d 960 (internal quotation marks omitted). To demonstrate that it is an "appropriate party," a plaintiff must further show that "the issues are unlikely to be raised if the party is denied standing." Id. (internal quotation marks omitted).
129 First, Appellants are "appropriate parties" with "the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions" with respect to the Article VI Claims. The "appropriateness" of a party under the public-interest standing doctrine is a question of competency. In the Sierra Club case, we determined that the Club "would have standing under the alternative [public-interest] test" due to its policy concerns and status as an "entity focused on protecting the environment." [15] Id. $42. The coalition of Appellants in the instant case is not as well-established or long-standing as the Sierra Club, but it similarly has policy concerns and has come together to "focus[ ] on" the instant constitutional challenge. Further, Appellants have shown themselves able to "effectively assist the court" in its consideration of the Article VI Claims. While the district court dismissed those claims, and we affirm that dismissal, Appellants have nevertheless done an admirable job of briefing the facts and controlling law. That their complaint ultimately failed to state a claim does not mean that they were not appropriate parties to bring it. While we hold today that the Bill does not violate the clear-title and single-subject rules of Article VI, Section 22, Appellants have caused this court to consider those rules and clarify the standards they impose for the first time in decades, and that in itself is a considerable achievement.[16]
1 30 Second, Sterra Club requires that "the issues [be] unlikely to be raised if the party is denied standing." Id. 186 (internal quotation marks omitted). We can certainly construct hypothetical plaintiffs who might be seen to have traditional standing to bring at least some of Appellant's claims. For instance, a teacher whose colleagues' salaries were raised under the Teacher Salary Supplement Program, but whose own salary was left unchanged, might invoke direct economic interests. Similarly, we can imagine a suit brought by a textbook publisher whose materials were rejected pursuant to the Textbook Approval Program. But our inquiry is not whether some hypothetical plaintiff can be imagined; it is whether "the issues are unlikely to be raised if the party is denied [public-interest] standing." Id. (emphasis *1110 added) (internal quotation marks omitted). Here, where the Board itself is silent and no other plaintiff has emerged in the years since the Bill's passage, we think that is indeed unlikely.
$31 One more feature of our prior statements on public-interest standing deserves mention. In Sterre Club, we observed that a court's recognition that a party has public-interest standing analysis
requires the court to determine not only that the issues are of a sufficient weight but also that they are not more appropriately addressed by another branch of government pursuant to the political process. The more generalized the issues, the more likely they ought to be resolved in the legislative or executive branches.
Id. 189 (emphasis added) (citation omitted). But Article VI, Section 22 places restrictions on the legislative process itself. Where the legislature has passed a bill and the governor has signed it, we cannot assume that either of those branches are appropriate parties to whom to entrust the prosecution of a claim that the bill violates the strictures of Article VI, Section 22. And "more generalized" in this context speaks not to the general nature of the interest-for that is inherent in every issue of "sufficient weight" to justify the recognition of public-interest standing-but rather to the generalized nature of the issue itself. [17] In other words, public-interest standing should not be used by courts to engage in review of nonjusticiable political questions. Here, Appellants' claims do not raise that type of question. Rather, they seek to enforce an explicit and mandatory constitutional provision dealing primarily with questions of form and process. See Uvax Const. art. I, § 26 ("The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.").
{32 We conclude that Appellants satisfy the requirements of the public-interest standing doctrine with respect to the Article VI Claims.[18]
D. The Article X Claims do not Rise to the Same Level of Great Constitutional Importance, and Appellants Are Not Appropriately Situated to Raise Them
133 Article X, Section 3 of the Utah Constitution provides: "The general control and supervision of the public education system shall be vested in a State Board of Education." Appellants claim that the Bill violates this provision in two respects. First, they object to the Teacher Salary Supplement Program, which delegates to the Utah Department of Human Resources Management the duty of administering a pilot program to provide salary enhancements to certain science teachers in Utah public schools in order to dissuade them from seeking private employment. Appellants claim this is an unconstitutional delegation of an element of the "general control and supervision of the public education system" to an executive agency other than the one with that constitutionally specified role Second, they argue *1111 that another provision of the Bill, which requires a private contractor to "evaluate and map the alignment of public school instrue-tional materials" to the "core curriculum," unconstitutionally delegates another element of that "general control and supervision."
1 34 As explained above, Appellants do not have standing to bring the Article X Claims under "the traditional criteria of [having al personal stake in the controversy." Jenkins v. Swan, 675 P.2d at 1150. For the following reasons, we determine that they also lack standing under the alternative public-interest standing doctrine. As articulated in Cedar Mountain, that doctrine provides that "parties [may] gain standing if they can show that they are an appropriate party raising issues of significant public importance." 2009 UT 48, 1 8, 214 P.3d 95. "[An appropriate party .... has the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions ...." Sterrae Club, 2006 UT 74, 136, 148 P.3d 960 (internal quotation marks omitted).
T35 Appellants fail to satisfy either element of the public-interest standing test with respect to their Article X Claims. First, while we have explained above that Appellants are "appropriate part[ies]" to raise the Article VI Claims, they are not as well situated to raise the Article X Claims. While the restrictions on the legislative process imposed by Article I, Section 22 give every citizen of Utah an interest in seeing them obeyed, the delegation in Article X, Section 83 of "general control and supervision of the public education system" to the Board does not create such a general interest. Further, Appellants below and in their briefs and argument on appeal have not proved themselves able to "assist the court in developing and reviewing all relevant legal and factual questions." Id. €36. The crucial question of how we are to understand the scope of "general control and supervision of the public education system," and the related question of what the historical practice and traditional core functions of the Board have been, were never sufficiently framed and answered. This played a role in the district court's grant of summary judgment in favor of Appellees on the Article X Claims.
986 In addition to demonstrating that they are "appropriate part[ies]," plaintiffs must also raise issues of "sufficient pub-lie importance" to have standing under the public-interest doctrine. Id. 140. Every constitutional provision is surely important, but not every alleged violation of a constitutional provision will provide a basis for public-interest standing. As discussed above, the single-subject and clear-title rules imposed on the legislature by Article VI, Section 22 meet that standard. They are restrictions which must be observed every time the legislature exercises its core function of passing laws. The provision at issue in the Article X Claims, in contrast, is a delegation of a defined subject to a particular agency. While we do not conclude that such questions can never be appropriate ones in which to employ the public-interest standing doctrine, in combination with the Appellants' lack of "appropriateness" to treat them, their more localized significance renders the public-interest standing doctrine inapplicable to these plaintiffs on these claims.
$37 Appellants further argue that their claims are unlikely to be brought by anyone else. As explained above, that is a necessary part of the showing parties must make under the public-interest standing doctrine. Id. 136. However, by itself it is not sufficient- and we have already determined that Appellants do not meet the other criteria for public-interest standing. Accordingly, we vacate the entry of summary judgment against Appellants on the Article X Claims and remand to the district court. The district court is directed on remand to dismiss these claims for lack of standing.
II. TRIAL COURTS DISMISSAL OF ARTICLE VI CLAIMS
138 Having determined that Appellants, although they lack standing under "the traditional criteria of [having al personal stake in the controversy," Jenkins v. Swan, 675 P.2d 1145, 1150 (Utah 1983), do have standing to bring the Article VI Claims under the alternative standard, we review the district court's grant of summary judgment on those claims. Again, Appellants claim that the Bill contains "more than one subject," and that *1112 its contents are not "clearly expressed in its title"; therefore, they argue, it violates Article VI, Section 22 in two respects. We determine that Appellants have failed to state a claim on either count.
A. -The Complaint did not State a Violation of the Single-Subject Rule
Y39 Again, Article VI, Section 22 provides that "no bill shall be passed containing more than one subject, which shall be clearly expressed in its title." Appellants argue that the Bill treats too many separate aspects of the public education system to pass muster under the single-subject rule. In their complaint, Appellants supported this claim by extensive reference to the legislative history of the items contained in the Bill. They point out that, when introduced as separate items, some had failed on a floor vote, some passed in one chamber but were held in committee in the other, and some were never submitted for even committee consideration as individual items. They further assert that popular bills were "used as hostages to extort or compel enactment of the less popular bills."
140 Almost a century ago, this court opined that while the single-subject rule '
is mandatory and binding alike upon the courts and the Legislature, yet it should be liberally construed in favor of upholding a law, and should be so applied as to effectuate its purpose in preventing the combination of incongruous subjects neither of which could be passed when standing alone. A too strict application of the provision might, however, result in hampering wholesome legislation upon any comprehensive subject rather than in preventing evils.
Salt Lake City v. Wilson, 46 Utah 60, 148 P. 1104, 1109 (1915). See also McGuire v. Univ. of Utah Med. Cir., 603 P.2d 786, 789 (Utah 1979) (citing similar language from State ex rel. Edler v. Edwards, 34 Utah 13, 95 P. 367, 368 (1908) as controlling authority). Furthermore, while bills must address a single subject, " '[there is no constitutional restriction as to the scope or magnitude of the single subject of a legislative act'" Martineau v. Crabbe, 46 Utah 827, 150 P. 301, 304 (1915) (emphasis added) (quoting the North Dakota Supreme Court's interpretation of their constitution's single-subject rule in State v. Morgan, 2 S.D. 32, 48 N.W. 314, 317 (1891)). "A liberal view should be taken of both the act and the constitutional provisions so as not to hamper the law making power, but to permit the adoption of comprehensive measures covering a whole subject." Kent Club v. Toronto, 6 Utah 2d 67, 305 P.2d 870, 873 (1957) (discussing both the single-subject and clear-title rules).
T 41 Other state courts have given a similar "liberal{ ] constru[etion]" to their constitutions' single-subject rules.[19] Seq, eg., Legislature v. Eu, 54 Cal.3d 492, 286 Cal.Rptr. 283, 816 P.2d 1309, 1321 (1991) ("[Thhe single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. It is enough that the various provisions are reasonably related to a common theme or purpose." (citation omitted)); Wirts v. Quinn, - Ill.2d -, 352 218, 953 N.E.2d 899, 905 (2011) ("In determining whether a particular enactment violates the single sub-jeet rule, we construe the word subject liberally in favor of upholding the legislation However ... the single subject requirement may not be cireumvented by selecting a topic so broad that the rule is evaded as a meaningful constitutional check on the legislature's actions." (internal quotation marks omitted)); Dague v. Piper Aircraft Corp., 275 Ind. 520, 418 N.E.2d 207, 214 (1981) ("One basic principle of our review is that, in considering the validity of an act under this constitutional provision, a very *1113 liberal interpretation is to be applied, with all doubts resolved in favor of the legislation's validity."); see also Comm. for a Healthy Future, Inc. v. Carnahan, 201 S.W.3d 503, 511 (Mo. 2006) ("When reviewing a single subject challenge to an initiative petition, this Court must liberally and non-restrictively construe the petition in such a way that the provisions connected with or incident to the central purpose of the proposal are harmonized and not treated as separate subjects.").
{42 Examined on its face,[20] under this liberal standard the Bill does not violate the single-subject rule All its provisions deal with public education. With one very minor exception, all its enactments and amendments are confined to Title 58A of the Utah Code.[21] We do not suggest that such confinement to one title or general subject area will always shield a law from claims that it violates the single-subject rule. Nor do we suggest that legislation which amends items located in two or more titles will per se be ruled unconstitutional. We have never established, and do not create today, a precise formula for determining whether a challenged act "contain[s] more than one subject." Urax Const art. VI, § 22. Such a formula may well be impossible to craft,[22] and might be undesirable even if it were possible.
143 It is easy to imagine a law that all would agree violates the single-subject rule. For instance, a bill dealing with pet licenses, mining regulation and beekeeping could not be plausibly argued to fit under any all-encompassing rubric less general than "legislation," or at the most specific "safety" (assuming that the pet licensing regime had that as its purpose)[23] Similarly, one can imagine items of legislation so targeted that no plausible argument could be made that they violate the single-subject rule. Most actual legislation, of course, falls somewhere in between, and while the single-subject rule is mandatory and must be policed by this court, see supro 127, under our tradition of liberal construction a bill addressing even a relatively large number of educational programs does not violate that rule. Cf. Akin v. Dir. of Revenue, 984 S.W.2d 295, 302 (Mo. 1996) (holding that a bill containing some twenty enactments and thirty-eight reenactments in the area of education, along with various revenue mechanisms to fund those laws, does not violate the single-subject rule "[gliving the measure the liberal reading required to sustain its constitutionality ... [be *1114 cause it] contains only one subject, education.").
{ 44 In addition to their general argument that the Bill contains too many disparate subjects, Appellants argue that it violates the single-subject rule for two specific reasons. First, they argue that it combines substantive law and appropriations measures,[24] and that such a combination is a per se violation of the rule. Second, they include in their complaint a detailed legislative history of the components of the Bill, and argue that the fact that some of these components were rejected by the legislature as individual bills, while others passed committee or a floor vote in one house but were then held and combined with the rest of the Bill's components, demonstrates that the Bill constitutes impermissible "bundling" and "log-rolling" in violation of the spirit of the single-subject rule.[25]
I 45 Appellants urge us to adopt what they represent as the rule of Washington State Legislature v. State, 189 Wash.2d 129, 985 P.2d 353 (1999) a bright-line test holding that the combination in one bill of substantive and appropriations measures violates the single-subject rule. While conceding that we have never before set such a test, Appellants argue that dicta in four of our previous opinions suggest such a result. But it is not clear to us that Washington State Legislature establishes any such bright-line test. Because the provision at issue was an item "in an omnibus appropriations or operating budget bill" that "restricted] access to public assistance eligibility," the court held that it violated the single-subject rule and struck it on that basis. Id. at 355, 368. The Bill before us neither "defines rights or eligibility for services" in the sense of the provision scrutinized in Washington State Legislature, nor is it included in a general "operating budget bill." [26] Accordingly, we do not see this case as providing persuasive authority that we should (1) announce a bright-line standard that any combination of funding and substantive measures violates the single-subject rule and then (2) find that the Bill violates that rule and accordingly declare it unconstitutional under Article VI, Section 22 of the Utah Constitution.
146 We are similarly unpersuaded by Appellants' argument that we have already endorsed such a bright-line standard. For instance, Appellants cite Carter v. State Tax Commission, 98 Utah 96, 96 P.2d 727, 733-34 (1989). There, we held that a specific part of a "plan of graduating [motor vehicle registration] fees according to the propensity of the vehicle to injure the highways" based upon "the fuel used in the engine of the vehicles" violated the single-subject rule. Id. at 733. Our explanation for this holding was that "Iwle have here an obvious departure from any thought of wear and tear upon the road"; the type of fuel used by a vehicle "bears no relationship to the object of the legislation." Id. In other words, Carter ruled that a provision that bore "no relationship" to a bill's larger purpose violated the single-subject rule-not, as Appellants frame it, because it was a revenue measure, but because it was incongruous with the rest of the bill.
T47 Among Appellants' other citations is one to Petty v. Utah State Board of Regents, 595 P.2d 1299 (Utah 1979). There we said "it is important to have in mind that the purpose of the Appropriations Act is to allocate finances, and not to affect substantive changes in the law on other matters." Id. at 1801. But the very next sentence reads: "Consequently, it is our opinion that such an expression of intent in an appropriations act should not be regarded as repealing or superseding other existing statutory law." Id. In Peilty, the plaintiff was a student arguing that a statement of "the intent of the Legislature" as to the appropriate level of tuition for medical students prevented the Board of Re *1115 gents charging fees beyond that level. Id. at 1800. In ruling that this statement of "intent" in a general appropriations bill had no substantive effect, we did not mention the single-subject rule. Appellants cite this case for its supposed analogic strength, but we do not see an analogy to the claims before us.
1148 We are unpersuaded by these cases, and by the other cases cited by Appellants in their urging us to establish. a rule that the combination of substantive and appropriations measures always violates the single-subject rule. We therefore decline to adopt such a rule. As explained above, the Bill on its face treats a single, albeit broad, subject: education. The presence in the Bill of funding measures directed towards education programs does not render it unconstitutional. We are left, then, with Appellants' remaining argument on this point: that the legislative history of the items in the Bill reveal that it is the product of impermissible "log-rolling," and that it therefore violates the single-subject rule.
"[ 49 In Appellants' description, the Bill
is the sum of 14 bills, all of which started as single subject measures. All initially were introduced, reviewed, considered, and debated as separate, stand-alone legislation. Two of these bills were defeated by majority vote in the House. Two others lacked sufficient merit to survive committee hearings. These failed bills were revived and, through bundling ...[,] were allowed to ride "piggy-back" on popular legislation and money measures to enactment at the eleventh hour of the 2008 general session.
For three reasons, however, we conclude that these facts-even taken at face value, as we do when reviewing the grant of a motion to dismiss-do not state a claim that the Bill violates the single-subject rule.
{50 First, the text of Article VI, Section 22 speaks to the contents and title of the Bill itself; it makes no reference to legislative motive. We have determined that the Bill itself, in treating multiple programs related to education, handles a "single subject"; we further determine that an itemized list of those programs is a clear expression of the Bill's content, which is what the clear-title rule requires. It is true that in Wilson we identified the "purpose" of the single-subject rule as "preventing the combination of incongruous subjects neither of which could be passed when standing alone." 148 P. at 1109 (emphasis added). But in light of our tradition of liberally construing the single-subject rule, see id., we have already concluded that the subjects in the Bill are not incongruous in the constitutional sense. Therefore, even taking at face value Appellants' assertions that portions of the Bill "could [not] be passed when standing alone," Wilson neither requires nor empowers us to find them unconstitutional solely on that basis if we have not determined that they are "incongruous." While the prevention of "log-rolling" may be a purpose of the single-subject rule, the text of that rule requires us to focus on a bill's contents, rather than conducting a review of a law's "backstory" as revealed in legislative history.
[51 Second, Appellants have not identified-and we have not independently found-any prior opinion of this court that analyzes a single-subject claim by reference to the legislative history of the bill at issue. Appellants cite McGuire, 608 P.2d 786, and Jensen v. Matheson, 583 P.2d 77 (Utah 1978), for the proposition that this court has previously examined legislative journals in its Article VI, Section 22 jurisprudence. This is true, but those cases dealt with other provisions of the section: respectively, the clear-title rule and a voting/recordation provision.[27] McGuire, 608 P.2d at 790; Jensen, 588 P.2d at 79-80. These cases do not establish the propriety of undertaking an extensive search of legislative history in the application of the single-subject rule, and we are not persuaded that we should depart from an examination of the Bill on its face, at least absent any ambiguity or other interpretive problems revealed by such a facial examination. To do so would *1116 put us in the position of examining the motives and strategies of the Legislature, rather than its acts.
152 Finally, where a bill has not been shown to violate the single-subject rule, separation-of-powers considerations make us hesitate to inquire into the internal process that led to the bill's passage. Sometimes we are required to, as it were, "pierce the veil" of the legislative text-for instance, when a facially neutral bill is alleged to have some impermissible invidious motive. And allegations of outright illegality, in the form of bribery or the like, have their remedy elsewhere in the law. But the line between forbidden "log-rolling" and mere "horse-trading" may be a fine one, and we are not confident in our ability-or even our constitutional power-to police it in the manner which Appellants ask of us.
B. The Complaint did not State a Violation of the Clear-Title Rule
T53 The Bill was entitled "MINIMUM SCHOOL PROGRAM BUDGET AMENDMENTS." Under this title came a caption identifying the session in which the Bill was submitted and its chief sponsor and sponsor in the House. Under this caption came a double line, then the following: "LONG TITLE{] General Description: This bill provides funding for the Minimum School Program and other education programs. Highlighted Provisions: This bill: [followed by a bullet-pointed list of short descriptions of the various components of the billl." [28] Appellants argue that the Bill violates the clear-title rule for two reasons. First, they argue that the "short title" is under-inclusive and misleading. Second, they argue that the "long title" does not cure the constitutional defect.
{54 This court considered the clear-title rule in Utah's first year of statehood. Ritche v. Richards, 14 Utah 345, 47 P. 670 (1896). There, we held that a bill entitled "An act relating to and making sundry provisions concerning elections," id. at 671 (emphasis added), could not constitutionally contain a provision governing the appointment of persons to vacated positions. Id. at 674. "This section," we determined, "does not relate to elections, nor does it concern elections. Therefore the title does not embrace it." Id.
1 55 A justice of a later generation enunciated general principles that guide our application of the clear-title rule:
[TJhe title is sufficient if it is not productive of surprise and fraud and is not calculated to mislead the legislature or the people, but is of such character as fairly to apprise the legislators and the public of the subject matter of the legislation and to put anyone having an interest in the subject on inquiry.
Thomas v. Daughters of Utah Pioneers, 114 Utah 108, 197 P.2d 477, 508 (1948) (Latimer, J., concurring). A more recent opinion saw the purpose of the clear-title rule as ensuring that "the legislators will be advised of the subject and purpose of the act in order that there be no misunderstanding, omitting, nor burying or obscuring of what is being proposed." Jensen, 588 P.2d at 80.
T 56 Here, the bill's "long title" informs the reader that "[this bill provides funding for the Minimum School Program and other education programs," proceeding to give a full list of those programs in bullet-point format. This is constitutionally sufficient-if the "long title" can be considered part of the "title" which the constitution says must "clearly express[ ]" the bill's "subject." Urax Const. art. VI, § 22.
[57 Appellants insist it cannot be so considered. First, they observe that Article VI, Section 22 speaks of the bill's "title" in the singular. Second, they argue that our case law has treated additional or supplementary titles of laws as unnecessary surplusage. Third, they argue that the clear-title rule is intended to benefit the public and that the public is less likely than the legislators to notice the presence of such additional titles.
*1117 158 Appellees and Amicus counter that a "long title" is an acceptable manner of observing the constitutional clear-title rule, and that in this case the Bill's "long title," as the constitution requires, clearly expresses the Bill's subject. We agree that the "long title" of this Bill is its title for purposes of Article VI, Section 22 and that it clearly expresses the Bill's subject. The Bill therefore does not violate the clear-title rule.
59 First, the fact that Article VI, Section 22 speaks of a bill's "title" in the singular is not dispositive. The Bill before us has a singular title. That title, it is true, is divided into a five-word header ("MINIMUM sCHOOL PROGRAM BUDGET AMENDMENTS") and a longer title, which is in turn divided into a "General Description" and a list of "Highlighted Provisions." But the text of Section 22 does not indicate how long or detailed a bill's "title" must be, or whether it may be divided into sub-parts. As we have interpreted and applied it above, the single-subject rule permits one bill to treat multiple aspects of the public education system. Accordingly, a title such as the one this Bill has is arguably the fairest way of putting legislators and citizens on notice of what the Bill contains.[29] If the Bill's contents are constitutional in scope-and we have determined that they are-then an itemized description of them is a constitutionally acceptable way to "clearly express[ ]" those contents.
T60 Second, Appellants cite Edwards, 95 P. at 869, in support of their argument that "the use of a second title may be constitutionally improper." The case is inapposite. In Edwards, we determined that certain "ex-trancous matter added to what constitutes the actual title is harmless. ... [and] wholly unnecessary, and the elimination of this surplus matter is ... required of us in order to preserve" an otherwise constitutional law. Id. (emphasis added). But here we have, if anything, the opposite situation. By itself, "MINIMUM SCHOOL PROGRAM BUDGET AMENDMENTS" might well be unconstitutionally under-inclusive. The "long title," with its list of programs contained in the Bill, removes the cloud over the Bill's constitutionality.[30]
1 61 Third and finally, we disagree that the "long title" is of use only to legislators. It is not written in technical or misleading language. It puts anyone reading it, whether they be a member of the legislature or of the general public, on notice of the Bill's contents. For all these reasons, we determine that the full title of the Bill comports with the constitutional requirement that it "clearly express[ ]" the subject of the Bill. UTax Const. art. VI, § 22.
CONCLUSION
T 62 We determine that Appellants do not have standing to bring any of their claims under the traditional doctrine of standing. We further determine that they lack standing to bring the Article X Claims even under the alternative doctrine of public-interest standing. Accordingly, we vacate the district court's grant of summary judgment and remand with respect to those claims, directing the court on remand to dismiss them for lack of standing. We further determine that Appellants do have standing to bring the Article VI Claims under the doctrine of public-interest standing. Since their complaint fails to state a claim for violation of either the single-subject or clear-title rules, however, we affirm the district court's dismissal with respect to those claims.
Justice DURHAM authored the majority opinion in which Associate Chief Justice NEHRING and Justice PARRISH joined.
*1118 Justice LEE filed a concurring, dissenting opinion in which Chief Justice DURRANT joined.
APPENDIX
[The following is a representation of the entire introductory portion of the Bill, containing both its short title and its long title]
MINIMUM SCHOOL PROGRAM BUDGET
AMENDMENTS
2008 GENERAL SESSION STATE OF UTAH
[names of sponsoring legislators omitted]
LONG TITLE
General Description:
This bill provides funding for the Minimum School Program and other education programs.
Highlighted Provisions:
This bill:
-- establishes the value of the weighted pupil unit at $2,577;
-_ establishes a ceiling for the state contribution to the maintenance and operations portion of the Minimum School Program for fiscal year 2008-09 of $2,497,012,086;
- modifies provisions related to the funding of charter schools;
- modifies requirements regarding instructional materials;
- authorizes the use of appropriations for accelerated learning programs for International Baccalaureate programs;
- modifies the positions that qualify for educator salary adjustments and increases the salary adjustments for those positions;
- establishes and funds the following ongoing programs: .
® a pilot project using-a home-based educational technology program to develop school readiness skills of preschool children;
® a financial and economic literacy passport to track student mastery of certain concepts;
@the Teacher Salary Supplement Program to provide a salary supplement to an eligible teacher;
e stipends for special educators for additional days of work;
® an optional grant program to provide an extended year for math and science teachers through the creation of Utah Science Technology and Research Centers;
® the High-ability Student Initiative Program to provide resources for educators to enhance the academic growth of high-ability students;
® the English Language Learner Family Literacy Centers Program; and
ecareer and technical education online assessment;
-_ makes one-time appropriations for fiscal year 2008-09 for:
e@epupil transportation to and from school;
® the Beverly Taylor Sorenson Elementary Arts Learning Program to provide grants to integrate arts teaching and learning into selected sehools; and
® classroom supplies;
- provides a repeal date for certain pilot programs;
-_ makes nonlapsing appropriations; and
- makes technical corrections.
Monies Appropriated in this Bill: [followed by nine enumerated appropriations]
Other Special Clauses:
This bill provides an effective date.
This bill coordinates with H.B. 1 by providing superseding and substantive amendments.
Utah Code Sections Affected: [followed by a list of sections amended and enacted]

. Two separate appeals were taken to this court: No. 20110277, appealing from the dismissal of the Article VI Claims, and No. 20110473, appealing from the grant of summary judgment on the Article X Claims. The appeals were consolidated for the purposes of argument; we hereby fully consolidate them and dispose of both appeals with this opinion.

. Our order permitting the amicus brief specified that this court "will not assume any particular scope of representation vis-a-vis the members of the Legislature."

. In Brown, we considered whether property owners had standing to seek an injunction preventing their neighbor from constructing a bridge over a creek near the border between their properties. 2010 UT 14, ¶ 1, 228 P.3d 747. "[Wle conclude[d] that the Browns' complaint satisfied] our traditional test for standing...." Id. (emphasis added). The dispute in Brown was patently not a candidate for public-interest standing, and indeed Brown does not discuss the alternative, public-interest test for standing. While "in Utah, as in the federal system standing is a jurisdictional requirement," id. the contours of our requirements for standing differ from those in the federal system. Our jurisdictional requirement is satisfied by either the traditional test or the public-interest test.

. While the judicial power of the state of Utah is not restricted, as is the federal judicial power, by the language of Article III of the United States *1103 Constitution, our power is, of course, not unlimited. We have observed that "the Utah Constitution ... mandates certain standing requirements, which emanate from the principle of separation of powers." Brown, 2010 UT 14, ¶ 12, 228 P.3d 747. But our standing requirements, based as they are on the law and constitution of our state, are not identical to those of the federal system. Cf. Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ., 487 Mich. 349, 792 N.W.2d 686, 694-95 (2010) (discussed infra ¶ 17).
The dissent correctly observes that the judicial power of this court is limited by the principle of separation of powers. Infra 169. Indeed, that principle is enshrined in the state constitution. ''The powers of the government of the State of Utah shall be divided into three distinct departments ... and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others...." Uran Const. art. V, § 1 (emphasis added). In entertaining a claim that the Legislature has violated the constitutional restraints on its lawmaking procedures, we are not "exercis[ing] a function" of either of the other branches of government. As the dissent notes, infra 169 n.3, see also infra 189, separation-of-powers concerns support the traditional standing doctrine requiring individualized injury. But in the absence of a textual requirement of "case or controversy" akin to those of the federal Article III, these concerns do not reflect an absolute, constitutionally-imposed jurisdictional requirement, but rather a "historical and pragmatic conviction that particular disputes are most amenable to resolution in particular forums." Jenkins v. Swan, 675 P.2d at 1149. The questions, for instance, of what level of funding is appropriate for public education, or how that funding should be distributed across the state, are-in the absence of constitutional or statutory claims-classic examples of "disputes most amenable to resolution in" non-judicial fora. The question of whether a law was passed in violation of Article VI, Section 22 is not such a dispute.
The dissent asserts that it is not urging the wholesale adoption of federal standing doctrine. Infra 169 n.4. Indeed, it suggests that federal standing doctrine has become too lax, implicitly arguing that our state standing doctrine is properly more restrictive than the federal practice under Article III of the United States Constitution. We are aware of no state court-even among those which have explicitly rejected an alternative, public-interest standing doctrine-which has taken such a position.

. The dissent argues, infra MM 67-69, 91 that our recent opinion in Utah Transit Authority v. Local 382 of the Amalgamated Transit Union (UTA), 2012 UT 75, 289 P.3d 582, weighs in favor of the "repudiat[ion] of the public interest approach" to standing, infra 192. It does not. UTA did not establish new law or doctrine; it reiterated that parties seeking to avail themselves of the "public interest'" exception to mootness must make a further showing that the dispute in question is capable of repetition yet likely to evade review. See 2012 UT 75, 133, 289 P.3d 582. Since mootness is a characteristic of a dispute between parties rather than a characteristic of the parties themselves, an exception to the usual prohibition on considering moot questions will hinge on the nature of the dispute. Conversely, traditional standing (or the lack thereof) is a characteristic not of the dispute between parties, but of the parties themselves. Therefore, the exception this court has established to the traditional standing requirements hinges not only on the importance of the dispute, but also on the nature of the party seeking to make the claim. See infra 1115, 28-29, 35.

. See also Haymond v. Bonneville Billing & Collections, Inc., 2004 UT 27, ¶ 6, 89 P.3d 171 ("In matters of great public importance, we have employed other tests [than the traditional one] to evaluate whether a plaintiff should be allowed to pursue a lawsuit where he has sustained no injury. Standing may be found if the matter is of great public importance, if the plaintiff, although lacking a distinct injury is in as good a position to challenge the alleged illegality as any other potential plaintiff, and if the issue is unlikely to ever be raised if the plaintiff is denied standing to sue.").

. This passage from Sierra Club also replaces a description of the Jenkins v. Swan test that we enunciated in Kennecott Corp. v. Salt Lake County, 702 P.2d 451 (Utah 1985). There, we framed the middle step as a requirement that "no one halve] a greater interest than [the plaintiff]." Id. at 454. Sierra Club reformulated the middle step, which both Jenkins v. Swan and Kennecott described as a requirement that no other more appropriate potential party exist, to an examination of whether the plaintiff at bar is or is not appropriate. Compare Sierra Club, 2006 UT 74, ¶ 36, 148 P.3d 960 ("[The notion that a court must find the most appropriate party, thereby limiting standing under the alternative criteria to only one party in any given case, is unnecessary and counter-productive."), with Kennecott, 702 P.2d at 454 ("If the plaintiff has no standing under the [traditional test], then he may have standing if no one has a greater interest than he l..."), and Jenkins v. Swan, 675 P.2d at 1150 ("If the plaintiff does not have standing under the [traditional test], we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff.").

. See also 1A C.J.S. Actions § 107 (2005) ("When the issues sought to be litigated are of great importance and interest to the public, they may, in some jurisdictions, be resolved in a form of action that involves no rights or obligations peculiar to the named parties. The doctrine of great public interest or importance must, however, be applied with caution in expanding or relaxing the definition of standing. Its exercise must be a matter where strict standards are applied to avoid the temptation to apply a judge's own beliefs and philosophies to a determination of what questions are of great public importance. Standing may be found under a public interest standing test if the matter is of great public importance, if the plaintiff, although lacking a distinct injury is in as good a position to challenge the alleged illegality as any other potential plaintiff, and if the issue is unlikely to ever be raised if the plaintiff is denied standing to sue." (footnotes omitted)).

. The dissent argues that "the traditional standing requirement is rooted in the constitution," infra 472, and supports this argument by reference to language in Article VIII of the Utah constitution, infra 173. That language "confers on our courts the 'judicial power,' and ... speaks of our authority to issue 'writs' and to decide 'cases.'" Infra 173 (quoting Ura Const. art. VIII, §§ 1, 3, 5). The dissent further argues that any alternative to traditional standing requirements would require "repeal or amend[ment of] the terms of Article VIII." Infra 172. But the dissent gives no suggestion of what the required constitutional text would say, nor does it cite an example from any other state constitution of an affirmative recognition of public-interest standing. In contrast, other state courts which-unlike Utah's-issue advisory opinions do so based on explicit constitutional authorization. See, eg., Mass. Const. pt. 2, ch. 3, art. 2 (authorizing the issuance of advisory opinions "upon important questions of law, and upon solemn occasions"); see also In re Advisory Opinion, 335 S.E.2d 890, 891 (N.C.1985) (declining to issue an advisory opinion on the ground that [the North Carolina Constitution does not authorize the Supreme Court" to do so). At the state level, the recognition of an alternative form of standing is simply not the type of jurisprudential development which is predicated on explicit constitutional authorization. The dissent suggests that this court requires explicit textual authorization to articulate the scope of the judicial power to assess standing. We reject this view..
The dissent asserts that "the conclusion (of unbridled, common-law power) does not at all follow from the premise (the lack of a 'case or controversy' clause)." Infra 1105. First, we disagree with the characterization of our public-interest standing doctrine as "unbridled." Second, we note that the dissent does not suggest what does follow from our constitution's lack of a "case or controversy" requirement. Again, the dissent's only suggested difference between state and federal standing doctrine is that the latter has become too lax. See supra 112 n.4; infra 169. We disagree, and align with the courts of numerous other states in determining that the lack of a "case or controversy" requirement in our state constitution permits the development of alternative, public-interest standing doctrines.

. See 59 Parties § 30 (2d ed. 2012) ('Unlike the federal courts, state courts are not bound by constitutional strictures on standing as with state courts standing is a self-imposed rule of restraint. State courts need not become enmeshed in the federal complexities and technicalities involving standing and are free to reject procedural frustrations in favor of just and expeditious determination on the ultimate merits. Standing in the state courts is a judge-made doctrine and is used to refuse to determine the merits of a legal controversy irrespective of its correctness where the party advancing it is not properly situated to prosecute the action." (footnotes omitted)).

. Some state courts have explicitly or implicitly rejected such an alternative standing doctrine. See, e.g., Sears v. Hull, 192 Ariz. 65, 961 P.2d 1013, 1017-19 (1998); In re Sandy Pappas Senate Comm., 488 N.W.2d 795, 797 (Minn.1992); City of Chattanooga v. Davis, 54 S.W.3d 248, 280 (Tenn. 2001) ("We are aware that some commentators have criticized adherence to the particularized injury requirement of the standing doctrine.... Indeed ... some states have adopted a 'public rights' exception to private party standing .... However, except with regard to the Office of the Attorney General, the courts of this state have yet to recognize a general 'public rights' exception to the standing requirement, and we decline to do so in this case." (citations omitted)). But we have not followed that course.
As noted above, supra 112 n.4, the dissent's position goes well beyond that of states which reject alternative standing in its suggestion that our doctrine of standing should, if anything, be more restrictive than the federal one. See infra 169 n.4.

. At least with respect to the federal system, "the Supreme Court [of the United States] has repeatedly held that if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." Ry. Labor Execs. Ass'n v. United States, 987 F.2d 806, 810 (D.C.Cir. 1993). Because we determine that all Appellants lack traditional standing on all four of their claims, that all Appellants have public-interest standing on the Article VI Claims, and that all Appellants lack public-interest standing on the Article X Claims, we need not consider whether this principle applies in Utah law.

. Appellants further assert that they possess standing as taxpayers. Taxpayer standing may be understood as a subset of public-interest standing. See, e.g., Olson v. Salt Lake City Sch. Dist., 724 P.2d 960, 962 & 962 n.1 (Utah 1986) (finding taxpayer standing to challenge disbursement of monies in a reserve fund by "applying the general principles enunciated in," inter alia, Jenkins v. Swan and Kennecott); see also Brummitt v. Ogden Waterworks Co., 33 Utalf 289, 93 P. 828, 831 (1908) (''To the extent that the water rates are excessive his taxes are increased, and the mere fact that it increases in like proportion the taxes of all other taxpayers does not deprive him of the right to maintain an action to arrest the waste of public funds."). That doctrine is more appropriate, however, for claims with a direct relation to the expenditure of monies, typically at the local level. While the programs treated by the Bill, as with everything government does, cost taxpayer money, here Appellants' claims are properly analyzed not as taxpayer claims but as claims brought in the "public interest" in a more general sense.

. In support of its argument that Utah's "judicial ancestry" includes a rule that "reserve[es] 'public' claims for public officials and allow[s] private suits only for special, individualized injuries," infra 11 82-83, the dissent cites Crockett v. Board of Education, 58 Utah 303, 199 P. 158, 159-61 (1921). In that case, this court held that a taxpayer had standing to seek a writ to compel statutorily mandated financial disclosure from a governmental agency where the statute "was designed for the benefit and interests of the citizen taxpayers so that they [could] be informed." Id. at 159; see infra 183. Similarly, we have previously determined that the restrictions imposed on the legislative process by Article VI, Section 22 were designed for the public interest and benefit-specifically, to prevent private interest capture by requiring legislation to be transparently titled and narrow in scope. See supra ¶ 26; Laney, 2002 UT 79, ¶ 34, 57 P.3d 1007. Where in Crockett we inferred standing from legislative design, here we infer it from constitutional design. Crockett does not undermine our analysis, but rather supports it.
The dissent references a second case in tandem with Crockett. In Startup v. Harmon, 59 Utah 329, 203 P. 637 (1921), this court held that a taxpayer lacked standing to seek a writ compelling a county to disburse funds to widowed mothers, even where such disbursement was statutorily required. Id. at 641. The instant case is, in our view, much closer to Crockett than to Startup. Indeed, from a separation-of-powers perspective, see supra "I 12 n.4, if-as in Crockett-taxpayers have standing to compel the publication of statutorily required audits, recognition of standing is even more appropriate where parties request only that the courts consider whether a given law was passed in accordance with the constitution, since the determination of that question does not require this court to instruct another branch of government to do anything other than obey the constitutional limits on that other branch's power.

. The dissent correctly notes that in Sierra Club "'the plaintiff satisfied traditional standing requirements." Infra 195. But whether or not "the court ... need[ed] to opine about an alternative (public right) standing test," infra I 95, the court did so "opine," in the form not of mere dicta but explicitly as an alternative holding. Sierra Club, 2006 UT 74, 135, 148 P.3d 960.

. The dissent criticizes our discussion as "post-hoc" and "circular{ }." Infra 1107, 108. We do not feel that under the circumstances and procedural history of this appeal this criticism is warranted. Since standing was never ruled on below (and, indeed, was only ever raised by Ap-pellees as a defense to the Article X claims, not the Article VI Claims), and was only addressed at appellate oral argument and in requested supplemental briefing, we have a full district-court record and appellate briefing by which to assess Appellants' competency and appropriateness visa-vis both sets of claims.
As the dissent observes, the standard we enunciate for the public-interest standing doctrine must be applied not only on appeal but at trial. Infra 1108 n.26. In our discussion of the doctrine, and our differential treatment of the Article VI and Article X Claims (as well as Appellants' appropriateness with respect to both sets of claims), we have provided guidance for trial courts in future cases. But a universally applicable formulation is neither appropriate nor available in this area. Traditional standing requirements have themselves been the subject of much discussion and refinement in this and other courts; so too is such refinement proper with the alternative doctrine.

. The dissent argues that the Article VI Claims "implicate issues that are among the most generalized one could imagine-involving structural restrictions on the legislative process, which affect all citizens in a general, undifferentiated manner." Infra n.29. We disagree. The interest in seeing the legislature observe the constitutional restrictions on its power is general, but the issue is not general in the relevant sense-it is not a question of legislative policy or executive practice, The question of the constitutionality of the Bill's passage is a specific question of the type which it is the special province of the courts to decide. See supra 112 n.4.

. We are mindful that "[the doctrine of great public interest or importance must ... be applied with caution," and that exercise must be a matter where strict standards are applied to avoid the temptation to apply a judge's own beliefs and philosophies to a determination of what questions are of great public importance." 1A C.J.S. Actions § 107 (2005). But in holding today that alleged violations of the requirements of Article VI, Section 22 are "questions ... of great public importance," we do not rely on our own beliefs, but rather on the text and structure of our constitution. This court has previously determined that the requirements of Section 22 express the intent of the people "to limit legislative power and prevent special interest abuse," and that they are "clearly motivated by a wariness of unlimited legislative power." Laney, 2002 UT 79, 134, 57 P.3d 1007; see also Pence v. State, 652 N.E.2d 486, 489 (Ind.1995) (Dickson, J., dissenting) (arguing that public-interest standing is appropriately recognized on alleged violations of a state's single-subject rule).

. The vast majority of state constitutions contain such provisions. See Millard H. Ruud, "No Law Shall Embrace More Than One Subject," 42 Minn. L. Rev. 389, 389 (1958) ("A one-subject rule for laws has found its way, in one form or another, into the constitutions of forty-one of our states."); see also Brannon P. Denning & Brooks R. Smith, Uneasy Riders: The Case for a Truth-in-Legislation Amendment, 1999 Uran L. Rev 957, 963, 1005-23 (updating the count to forty-three and providing an appendix listing all state constitutions with single-subject and/or clear-title rules, with their exact wording and date of adoption}.

. For the moment, we only consider whether the Bill facially violates the single-subject rule. Below, we discuss and reject Appellants' other arguments for violation.

. The one exception was an amendment in then-Title 63, Chapter 55B, a table of "Repeal Dates By Title." (That Chapter has since been renumbered as Title 631, Chapter 2.)

. See Richard Briffault, The Item Veto in State Courts, 66 Temp. L. Rev. 1171, 1177-78 (1993) ("'The notion of a subject is inherently incapable of precise definition .... Lacking a clear definition of 'single-subject' and reluctant to intervene in the internal workings of the legislative process, courts have generally held that the single-subject rule is to be given a 'liberal' interpretation and have strained to uphold the constitutionality of most challenged measures. The invalidation of a state law for a violation of the single-subject rule is a rarity." (footnote omitted)). But see Michael D. Gilbert, Single Subject Rules and the Legislative Process, 67 U. Pitt. L. Rev 803, 819 & Fig. 1, 821 (2006) (purporting to show a dramatic rise in recent decades in the amount of single-subject challenges nationwide and concluding that "[in recent years, single subject litigation has blossomed").

. The federal constitution, of course, lacks a single-subject rule, and federal acts often take the form of a congeries of subjects no less incongruous than the three listed above. See generally Denning & Smith, supra n.19 (arguing for the adoption of a single-subject rule at the federal level); cf. Wash. State Legislature v. Lowry, 131 Wash.2d 309, 931 P.2d 885, 895 (1997) ("Our [state] constitution also evidences a clear policy that bills should pertain to single subjects and should not be encumbered by 'riders' containing divergent subjects, as is the practice in Congress 2").
Some state courts appear to have set the bar for what constitutes a violation of the single-subject rule at the level of total incongruity. E.g., People v. Cervantes, 189 Ill.2d 80, 243 Ill.Dec. 233, 723 N.E.2d 265, 267 (1999) ("[A] legislative act violates the single subject rule when the General Assembly includes within one bill unrelated provisions that by no fair interpretation have any legitimate relation to one another." (internal quotation marks omitted)). We need not establish so liberal a test in order to conclude *1114 that the Bill in question today does not violate the single-subject rule.

. In addition to individual programs enacted or amended, including the Textbook Approval and Teacher Salary Supplement Programs, the Bill also both provided funding for programs established in the bill and adjusted funding levels for already existing programs.

. See Pass v. Kanell, 98 Utah 511, 100 P.2d 972, 978 (1940) (identifying the prevention of "hodge podge or 'log rolling' legislation" as "one, and perhaps the primary, object of"" the single-subject rule (internal quotation marks omitted)).

. We note that general appropriations bills are specifically exempted from the single-subject rule. Uran Const. art. VI, § 22.

. "The vote upon the final passage of all bills shall be by yeas and nays and entered upon the respective journals of the house in which the vote occurs." Uraxw Const. art. VI, § 22 (emphasis added). This provision clearly contemplates an examination of material in addition to the final bill; the single-subject rule does not.

. See Appendix for a representation of the entire introductory section to the Bill, including both its "short" and "long title."

. General principles of separation of powers further suggest that we ought to refrain from dictating to the Legislature the form that the titles of its laws must take. The state constitution requires only that titles clearly express their bills' subjects. We are wary of imposing further requirements.

. Appellants also cite Marioneaux v. Cutler, 32 Utah 475, 91 P. 355, 359 (1907) ("[The Legislature may not disregard the [clear-title rule] by simply making the legislative intention clear in the act itself."). But that case upheld the challenged provision, since "a reasonable doubt exist[ed] .., whether the subject of the act is expressed in the title, [and] such doubt will be resolved in favor of the act." Id.