# IN THE SUPREME COURT OF IOWA

No. 19–0094

Filed May 1, 2020

**GARY DICKEY JR.,**

Appellant,

vs.

**IOWA ETHICS AND CAMPAIGN DISCLOSURE BOARD,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.

A citizen appeals the dismissal of his petition for judicial review of a ruling by the Iowa Ethics and Campaign Disclosure Board. **AFFIRMED.**

Gary Dickey of Dickey & Campbell Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and David M. Ranscht, Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

At the end of 2017, the Governor and her spouse traveled to Memphis, Tennessee, on a corporate jet. An individual donor to her campaign paid for the trip. While in Memphis, the Governor engaged in activities related to her 2018 election campaign and also attended the Liberty Bowl football game. Her campaign committee reported the trip as a $2880.00 campaign contribution from the individual, relying on an Iowa Ethics and Campaign Disclosure Board (Board) rule that requires a candidate who receives noncommercial air transportation from a corporation to reimburse the corporation at the rate of the undiscounted coach class airfare.

An attorney with campaign finance experience complained to the Board that the Governor had underreported the fair market value of the trip. When the Board dismissed the complaint, the attorney petitioned for judicial review pursuant to Iowa Code section 17A.19 (2017). The district court dismissed the petition for lack of standing, and the court of appeals affirmed.

On further review, we affirm the judgment of the district court and the decision of the court of appeals, substantially for the reasons set forth in their cogent opinions. We conclude the attorney is not an "aggrieved or adversely affected" party within the meaning of Iowa Code section 17A.19. While parties who allege they are *missing information* that the campaign laws require to be disclosed may have standing, *see FEC v. Akins*, 524 U.S. 11, 21, 118 S. Ct. 1777, 1784 (1998), this case is different. The attorney in this case *does not allege he is lacking any relevant information* and merely voices a disagreement over the reporting method used by the candidate committee.

## II. Facts and Procedural History.

On December 30, 2017, the Governor and her spouse traveled to Memphis, Tennessee, on a corporate private jet.[1] The jet was owned by Sedgwick Claims Management Services, Inc.—a Memphis-based company that does business with the state, administering workers' compensation claims filed by injured state employees. Sedgwick's President and CEO, David North, paid for the flight by reimbursing the company for the cost of the private jet service provided. While in Memphis, the Governor engaged in activities related to her election campaign and also attended the Liberty Bowl football game in which Iowa State University was a participant.[2]

To comply with campaign disclosure requirements, on its January 19, 2018 disclosure report, the Kim Reynolds for Iowa candidate committee reported an in-kind contribution of $2880.00 as the fair market value of the airfare. *See* Iowa Code §§ 68A.402–.402A (2017) (outlining disclosure requirement and information to be disclosed). The committee listed the donor, North; the description of the in-kind contribution, travel/flight; and the estimated fair market value, $2880.00.

After a news article appeared regarding the Governor's late-December trip, attorney Gary Dickey filed a complaint with the Board. In the complaint, Dickey alleged the committee underreported the fair market value of the in-kind contribution from North. Dickey claimed that the fair market value of the round-trip service for the Governor and her spouse on

---

[1]Two adult children of the Governor and her spouse also came on the trip but did not participate in campaign activities. Another citizen filed a complaint with the Board about that issue. The Board dismissed that complaint, finding that Iowa law permitted the adult children's acceptance of the plane trip as a gift. *See* Iowa Code §§ 68B.2(11) (limiting "[i]mmediate family members" to "the spouse and dependent children of a public official or public employee"), .22(1) (prohibiting a public official "or that person's immediate family member" from accepting or receiving a gift "from a restricted donor").

[2]The Governor's family paid personally for their football tickets.

the private jet was higher than $2880.00. To support this assertion, Dickey attached three round-trip quotes for private charter seats on a Gulfstream G200, the kind of jet on which the Governor and her spouse had flown to Memphis on December 30, 2017.

The matter went before the Board on September 20, 2018. After discussion, the Board dismissed the complaint. In its written order of dismissal, the Board relied in part on Iowa Administrative Code rule 351—4.47(4)(*a*), which states that when a candidate "uses noncommercial air transportation made available by a corporate entity," the candidate shall reimburse the corporate entity in advance for "the coach class airfare (without discounts)" if the destination is served by regularly scheduled commercial service. The Board added,

> While the rule expressly allows a candidate . . . to reimburse a corporate entity for the use of a corporate airplane, we never intended for this rule to prohibit a candidate's committee or permissible contributor to similarly reimburse a corporation for the fair market value of the use of an airplane.

In sum, the Board found no indication that the Governor's campaign committee had violated any law.

On October 9, Dickey filed a petition for judicial review in the District Court for Polk County. The petition alleged that the Board had improperly relied on rule 351—4.47(4)(*a*) and Internal Revenue Service regulation 26 C.F.R. § 1.61-21. According to Dickey, based on quotes from three private jet service providers, the value of the December 30, 2017 round-trip flight was "far in excess of $2,880.00." Dickey sought reversal and remand.

The Board filed a pre-answer motion to dismiss. It urged that Dickey lacked standing to seek judicial review of the Board's ruling. Dickey resisted the motion, and the court heard oral argument on November 16,

2018. Thereafter, on December 26, the district court granted the Board's motion. The court reasoned in part as follows,

> Regardless of which party is more correct about valuation, Mr. Dickey has not been injured by the Board's action. The committee has reported the in-kind contribution and its estimated value. Mr. Dickey has access to that reported value and is free to disagree with that reported value. . . .
>
> . . . .
>
> . . . Mr. Dickey has not been deprived of any information. He simply disagrees with the reported valuation. The quotes he obtained demonstrate that he can independently evaluate the reported value.

Dickey filed a notice of appeal on January 16, 2019. We transferred the case to the court of appeals. On September 11, the court of appeals affirmed the district court's dismissal of Dickey's petition. The court concluded, "We agree with the district court Dickey has not demonstrated 'a specific and injurious effect' such that he may obtain judicial review of the Board's ruling."

On October 1, Dickey applied for further review, and we granted his application.

**III. Standard of Review.**

"We review a decision by the district court to dismiss a case based on the lack of standing for errors at law." *Hawkeye Foodservice Distrib. Inc., v. Iowa Educators Corp.,* 812 N.W.2d 600, 604 (Iowa 2012) (quoting *Godfrey v. State,* 752 N.W.2d 413, 417 (Iowa 2008)).

**IV. Analysis.**

Iowa Code section 68B.33 provides that "[j]udicial review of the actions of the [B]oard may be sought in accordance with chapter 17A." The Iowa Administrative Procedure Act (IAPA), chapter 17A, provides that "a person or party who is aggrieved or adversely affected by agency action

may seek judicial review of such agency action." Iowa Code § 17A.19. Thus, to have standing to challenge an administrative action in court under the IAPA, "the complaining party must (1) have a specific, personal, and legal interest in the litigation; and (2) the specific interest must be adversely affected by the agency action in question." *Medco Behavioral Care Corp. of Iowa v. Iowa Dep't of Human Servs.*, 553 N.W.2d 556, 562 (Iowa 1996); *see also Polk County v. Iowa State Appeal Bd.*, 330 N.W.2d 267, 273 (Iowa 1983). Notably, "a person may be a proper party to agency proceedings and not have standing to obtain judicial review." *Richards v. Iowa Dep't of Revenue & Fin.*, 454 N.W.2d 573, 575 (Iowa 1990).

A "general interest" in the proper enforcement of the law cannot support standing to obtain judicial review. *Id.* "A general interest shared by all citizens in making sure government acts legally is normally insufficient to support standing . . . ." *Godfrey*, 752 N.W.2d at 423–24. For example, in *Richards*, we held that an individual's interest in seeing the tax laws properly enforced was not enough to support standing, but the pecuniary effects of a higher tax burden due to the improper grant of a tax exemption to somebody else could be sufficient. 454 N.W.2d at 575–76.

In this case, Dickey's petition alleges the Governor and her spouse flew to Memphis on December 30, 2017, to attend a campaign event and watch the Liberty Bowl. They traveled on a 2010 Gulfstream jet owned by Sedgwick, a Memphis-based company that administers workers' compensation claims filed by injured state employees. The chief executive officer of the corporation, North, personally reimbursed the corporation for the use of the plane, and the Governor's candidate committee reported the trip as a contribution from the CEO with an estimated fair market value

of $2880. The petition alleges that the value of the flights taken by the Governor and her spouse was actually "far in excess of $2,880."

The petition seeks review of the Board's decision that the Governor's candidate committee properly reported the fair market value of the flights taken by the Governor and her spouse. The Board found the fair market value of the trip could be reported using coach class airfare between Des Moines and Memphis, based on the Board's own rule 351—4.47(4).[3] Dickey alleges that rule 351—4.47(4) was inapplicable and that the candidate committee "underreported" fair market value.[4]

Critically, for standing purposes, Dickey does not allege that *he* lacks any relevant information concerning this December 30 campaign contribution that took the form of a plane trip. In fact, Dickey includes considerable detail in his petition and also incorporates by reference a newspaper article with additional detail. Dickey contends only that a higher value of the flights should have been reported than actually was reported.

Dickey's declaration is of the same ilk. It too does not suggest that *he personally* is injured by deficient campaign reporting concerning the

---

[3]Iowa Administrative Code rule 351—4.47(4) provides in part,

> *a. Air travel.* A candidate, candidate's agent, or person traveling on behalf of a candidate who uses noncommercial air transportation made available by a corporate entity shall, in advance, reimburse the corporate entity as follows:

> (1) Where the destination is served by regularly scheduled commercial service, the coach class airfare (without discounts).

[4]Dickey notes that rule 351—4.47(4) by its terms speaks to the amount the candidate committee must reimburse the corporation for the campaign's use of the jet, *not* the amount the campaign must report as a contribution if another individual reimburses the corporation for the use of the jet. Of course, even if rule 351—4.47(4) *is limited to its literal terms*, this means that North could have contributed $2880 to the Governor's campaign committee and the committee could have turned around and paid $2880 to Sedgwick for the flights. The Board evidently viewed the distinction between the two scenarios as immaterial.

December 30 flight. Dickey instead recites in three paragraphs his prior expertise in advising campaigns. He then states that he "regularly consult[s] with candidate committee reports filed with the [Board] and the Federal Election[] Commi[ssion] to aid in [his] evaluation of candidates for public office." He adds that he has voted in every Iowa gubernatorial election since becoming legally eligible to vote, that he reviews campaign disclosure reports before casting his vote, and that he "find[s] access to accurate campaign finance information necessary for [him] to evaluate the gubernatorial candidates and track whether a candidate's most generous donors receive special favors in return."

These general statements about the desirability of accurate campaign finance reporting, however, are not tied to the specific complaint in this case. Dickey does not allege that he needs (or needed) any additional information before deciding whether or not to vote for the Governor. Dickey does not allege that he lacks (or lacked) any information relevant to the Governor's trip to Memphis on December 30. His own petition describes the mode of travel, whose plane it was, who paid for the trip, and what the payor's relationship to the State was.

Perhaps Dickey's unstated position is that the Board should abandon rule 351—4.47(4) and develop a different rule for future use. But that is not what his complaint and petition seek. Dickey did not ask for rulemaking or a declaratory order. Instead, Dickey's complaint was directed at the Governor's candidate committee alleging specific underreporting of a dollar amount in regard to a specific trip.

Dickey argues he has standing under the United States Supreme Court's decision in *FEC v. Akins*, 524 U.S. 11, 118 S. Ct. 1777 (1998). In that case, a group of voters sought judicial review of a Federal Election Commission (FEC) determination that the American Israel Public Affairs

Committee (AIPAC) was not a political committee under federal election law. *Akins*, 524 U.S. at 13–14, 118 S. Ct. at 1780–81. The Court found that the voters had standing because registration as a political committee would require AIPAC to disclose its donors, contributions, expenditures, and disbursements. *Id.* The voters in turn were being injured by lacking this information. *Id.* at 20–21, 118 S. Ct. at 1784. As the Court explained,

> The "injury in fact" that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors (who are, according to AIPAC, its members), and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular.

*Id.* at 21, 118 S. Ct. at 1784.

This case is different. The relief that Dickey seeks from the Board—a determination that the Governor's candidate committee underreported the fair market value of the trip—will not provide him any additional information. Dickey already knows the facts about the trip. In fact, he attached to his complaint three different air charter quotes for a Gulfstream G200 to support his views that the trip was worth more than the candidate committee reported. He even came up with his own fair market value, stating that the seats on the plane should be valued at "$4,580 on the low-end, $8,458 on the high-end, and an average of $6,216."

An administrative decision that the Governor's candidate committee underreported the fair market value of the plane trip might result in some adverse publicity for the Governor. Still, even if a petitioner desired that

result, it would not be the kind of personal interest that would support standing. Courts exist to hear claims brought by injured parties; Dickey is not injured.

As the United States District Court for the District of Columbia has explained, there is a critical distinction between denials of requests for information and denials of "requests for information concerning 'whether a violation of the law has occurred.'" *Friends of Animals v. Jewell*, 115 F. Supp. 3d 107, 113 (D.D.C. 2015) (quoting *Common Cause v. FEC*, 108 F.3d 413, 418 (D.C. Cir. 1997)). The complaint in the present case falls into the latter category, and such requests do *not* satisfy the injury-in-fact requirement. *Id.*; *accord Vroom v. FEC*, 951 F. Supp. 2d 175, 179 (D.D.C. 2013) ("Mr. Vroom seeks no additional facts but, rather, a legal determination . . . .").

In *Citizens for Responsibility & Ethics in Washington (CREW) v. FEC*, 799 F. Supp. 2d 78 (D.D.C. 2011), a watchdog group complained to the FEC that a political action committee had disbursed money in travel expenses to benefit a congressman's presidential campaign which should have been reported as a contribution to the campaign. *Id.* at 81–82. The FEC dismissed CREW's complaint, reasoning that at most half the funds spent by the PAC should have been reported as a contribution to the campaign, which would have resulted in a de minimis excessive contribution of only $100. *Id.* at 83–84. Subsequently, the district court found that CREW had no standing to pursue judicial review, observing that "Plaintiffs' Amended Complaint demands only amended FEC filings to reclassify disbursements of which they are already aware . . . ." *Id.* at 89.

That is essentially the situation here. Dickey simply wants the Board to say that the original filing was wrong and to require the

Governor's candidate committee to make an amended filing that values the plane trip at $6216.

An earlier case involving CREW is also relevant. In *Citizens for Responsibility & Ethics in Washington v. FEC*, 401 F. Supp. 2d 115 (D.D.C. 2005), *aff'd*, 475 F.3d 337 (D.C. Cir. 2007), the watchdog group had complained about the delivery of a potential donor master list to the Bush-Cheney reelection campaign, which it contended was an illegal in-kind contribution. *Id.* at 116–17. The FEC agreed the contact list constituted an in-kind contribution but closed the investigation. *Id.* at 117. CREW then filed a judicial-review complaint. *Id.* CREW wanted "the FEC to require the administrative defendants to assign a monetary value to the list, and to disclose publicly that dollar figure . . . ." *Id.* The district court dismissed CREW's complaint for lacking of standing, reasoning in part,

> Whether the list is worth one hundred dollars or one thousand, for example, is of no moment because the public already knows: (1) that an illegal in-kind contribution took place; (2) that the in-kind contribution was a master contact list containing the names and contact information of conservative activists; (3) that the list's monetary value is negligible; and (4) the identities of the individuals and campaign involved in the illegal transaction. This readily available information, rather than the precise value that CREW seeks, is what appears to be "useful in voting."

*Id.* at 121.

Arguably, Dickey's position is weaker here. He is not suing as a watchdog group and has no members' interests to assert. He can only assert his own informational interest. His petition and exhibits make clear that there is no gap in his knowledge regarding the December 30, 2017 trip that would be filled by granting his Board complaint.

### V. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court and the decision of the court of appeals.

**AFFIRMED.**

All justices concur except Appel, J., who dissents and McDermott, J., who takes no part.

#19–0094, *Dickey v. Iowa Ethics & Campaign Disclosure Bd.*

**APPEL, Justice (dissenting).**

I respectfully dissent.  The sole issue raised in this case is whether the Iowa legislature in Iowa Code chapter 68B (2017) established the cause of action that Gary Dickey asserts in this action.  I conclude that the best interpretation of the statute is that it establishes a statutory right to disclosure of accurate information and that when inaccurate information is allegedly provided and the Iowa Ethics and Campaign Disclosure Board (Board) takes no action, the statutory right may be enforced by Dickey or any other complainant under the Iowa Administrative Procedures Act (IAPA).

**I. Overview of Relevant Campaign Finance Legislative Provisions.**

**A. Disclosure Requirements for In-Kind Contributions.**  In Iowa Code section 68A.402A, the legislature imposed substantive requirements for disclosure of campaign contributions and expenditures by candidate committees.  Iowa Code section 68A.402A(1)(*d*) requires disclosure of in-kind contributions, and the committee receiving an in-kind contribution is required to "report the estimated fair market value of the in-kind contribution."  If a candidate receives an in-kind contribution but does not disclose its fair market value in its report, a violation of Iowa Code chapter 68A occurs.  *Id.*

**B. Enforcement Provisions.**  The legislature provided for enforcement of the substantive provisions of Iowa Code chapter 68A in the succeeding chapter, Iowa Code chapter 68B.  The legislature provided that "[a]ny person may file a complaint alleging that a . . . committee . . . has committed a violation of chapter 68A."  *Id.* § 68B.32B(1).  Upon receipt of

a complaint, the Board staff reviews the complaint to determine "if the complaint is sufficient as to form." *Id.* § 68B.32B(2).

If a complaint is "sufficient as to form," it is referred "for legal review." *Id.* Upon completion of legal review, the chairperson of the Board is advised whether, in the opinion of the legal advisor, the complainant states an allegation which is "legally sufficient." *Id.* § 68B.32B(4). After receiving the opinion of the legal advisor, the chairperson refers the matter to the Board for a formal determination of the sufficiency of the allegations in the complaint. *Id.* § 68B.32B(5).

If the Board determines that the complaint is not sufficient, the complaint is dismissed, with notice of dismissal stating the reason or reasons for the dismissal sent to the complainant. *Id.* § 68B.32B(6). The Board may, however, initiate an investigation. *Id.* § 68B.32B(7). If the Board determines after investigation that there is no probable cause, the complaint may be dismissed, with notice to the complainant. *Id.* § 68B.32B(9).

If the Board determines there is probable cause, it may initiate a contested case proceeding. *Id.* If the Board concludes that a violation occurred after a contested case hearing, it may issue various remedial orders. *Id.* § 68B.32D(1). If a person fails to comply with an action of the Board, the Board may petition the district court for an order for enforcement of the action of the Board. *Id.* § 68B.32D(3).

**C. Judicial Review.** Iowa Code section 68B.33 is a two-pronged provision related to judicial oversight. It states, "Judicial review of the actions of the board may be sought in accordance with chapter 17A. Judicial enforcement of orders of the board may be sought in accordance with chapter 17A." *Id.* § 68B.33. This provision authorizes judicial review both of actions and the failure to act by the Board. Iowa Code section

17A.19 provides for judicial review of agency action by "a person or party who is aggrieved or adversely affected by agency action."

**II. *Akins*, "Informational Standing," and Legislative Action.**

**A. Introduction.** For the most part, the parties characterize the question of whether Dickey may challenge the Board's dismissal of his complaint as a question of standing. Dickey spends considerable time in his brief urging that this case involves "informational standing" under the important case of *FEC v. Akins*, 524 U.S. 11, 118 S. Ct. 1777 (1998). He also claims, however, that "[t]he question is whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami*, 581 U.S. ___, 137 S. Ct. 1296, 1302 (2017). The Board suggests that Dickey does not qualify for informational standing under applicable precedents because he already knows the information which he purportedly seeks and that his efforts simply amount to an attempt to force the Board to enforce what Dickey sees as the law against the candidate committee in this case.

To the extent the question of standing is involved in this case, it raises an issue of state law. While the United States Constitution in Article III limits the exercise of judicial power to "cases" and "controversies," there is no comparable provision in the Iowa Constitution. U.S. Const. art. III, § 2.

With the notable exception of *Akins* and its progeny, some federal caselaw has tended to emphasize the limits on access to the federal courts. In particular, in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563–66, 112 S. Ct. 2130, 2138–39 (1992), the Supreme Court departed from its prior trajectory by discovering new, more restrictive standing requirements to be applied in federal courts.

State courts as courts of general jurisdiction, however, operate under a different tradition. *See Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 720 (Fla. 1994). The state court tradition tends to emphasize a preference for expeditious determination of controversies on the merits. *See, e.g., Jen Elec., Inc. v. County of Essex*, 964 A.2d 790, 801–02 (N.J. 2009) (" '[O]verall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of "just and expeditious determinations on the ultimate merits" ' . . . premised on a core concept of New Jersey jurisprudence, that is, that our 'rules of procedure were not designed to create an injustice and added complications but, on the contrary, were devised and promulgated for the purpose of promoting reasonable uniformity in the expeditious and even administration of justice.' " (first quoting *Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y.*, 275 A.2d 433, 438 (N.J. 1971); and then quoting *Handelman v. Handelman*, 109 A.2d 797, 802 (N.J. 1954))).

A body of scholarship has emerged suggesting that state courts should decline to follow the federal model on standing issues in light of their own constitutional traditions. *See, e.g.,* F. Andrew Hessick, *Standing in Diversity*, 65 Ala. L. Rev. 417, 418 (2013) ("One consequence of understanding standing to be bound up in the merits is that, in cases involving state law brought under diversity jurisdiction, standing should turn on state law."); Jack L. Landau, *State Constitutionalism and the Limits of Judicial Power*, 69 Rutgers U. L. Rev. 1309, 1315–16 (2017) [hereinafter Landau, *State Constitutionalism*] ("[S]tate courts are mistaken in relying on federal justiciability doctrine at all in determining the existence of constitutional limitations on the exercise of state judicial power . . . [since]

federal and state courts are different in significant ways . . . [and the] federal justiciability analysis does not stand up to scrutiny on its own terms." (Emphasis omitted.)); Hans A. Linde, *The State and the Federal Courts in Governance: Viva La Différence,* 46 Wm. & Mary L. Rev. 1273, 1274 (2005) [hereinafter Linde, *State and Federal Courts*] ("We should not assume one common analysis in the face of legal differences that are truly constitutional—that is to say, 'constitutive' of government—and for which state courts take on responsibilities that federal courts decline.").

A number of states have used the textual difference between Article III and provisions of state constitutions to reject the federal standing jurisprudence. For instance, in *Lansing Schools Education Ass'n v. Lansing Board of Education,* 792 N.W.2d 686 (Mich. 2010), the Michigan Supreme Court declared, "There is no support in either the text of the Michigan Constitution or in Michigan jurisprudence . . . for recognizing standing as a constitutional requirement or for adopting the federal standing doctrine." *Id.* at 693. Similarly, the Mississippi Supreme Court in *SASS Muni-V, LLC v. DeSoto County,* 170 So. 3d 441 (Miss. 2015), declared, " 'It is well settled that "Mississippi's standing requirements are quite liberal" ' compared to the standing requirements set out in Article III of the United States Constitution." *Id.* at 445–46 (quoting *State v. Quitman County,* 807 So. 2d 401, 405 (Miss. 2001)). Indeed, the Mississippi Supreme Court has stated that "while federal courts adhere to a stringent definition of standing, limited by Art. 3, § 2 of the United States Constitution to a review of actual cases and controversies, the Mississippi Constitution contains no such restrictive language." *Quitman County,* 807 So. 2d at 405. Similarly, the New Jersey Supreme Court has observed that "[u]nlike the Federal Constitution, there is no express language in New Jersey's Constitution which confines the exercise of our judicial

power to actual cases and controversies." *Crescent Park Tenants Ass'n*, 275 A.2d at 437 (citing U.S. Const. art. III, § 2; N.J. Const. art. VI, § 1); *see also ACLU of N.M. v. City of Albuquerque*, 188 P.3d 1222, 1226–27 (N.M. 2008); *Couey v. Atkins*, 355 P.3d 866, 899–900 (Or. 2015) (en banc).

Several states have held that standing generally is determined by reference to the individual cause of action, approximating older state and federal caselaw. For instance, in *Save Homosassa River Alliance, Inc. v. Citrus County*, 2 So. 3d 329 (Fla. Dist. Ct. App. 2008), in a dissent, standing was equated with access to a cause of action. *Id.* at 343 (Pleus, J., dissenting). Similarly, the North Carolina Supreme Court in *Goldston v. State*, 637 S.E.2d 876 (N.C. 2006), declared that access to the court was dependent upon the cause of action. *Id.* at 879–80.

Some states, however, have taken the position that standing requirements under a state constitution are similar to that imposed by Article III and that, as a result, federal caselaw may be persuasive authority. *See, e.g.*, *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 226 P.3d 567, 569 (Mont. 2010). Even where the question of standing is prudential rather than jurisdictional, federal caselaw may be used for guidance on discretionary standing questions. For instance, in *Greer v. Illinois Housing Development Authority*, 524 N.E.2d 561 (Ill. 1988), the Supreme Court of Illinois noted that while it was not required to follow federal caselaw, Illinois would look to the federal caselaw for guidance selectively rather than automatically adopting the federal approach wholesale. *Id.* at 574. In *Dover Historical Society v. City of Dover Planning Commission*, 838 A.2d 1103 (Del. 2003), the Delaware Supreme Court stated that although it applied the concept of standing as a matter of self-restraint, Delaware courts generally apply the same standards as the federal courts. *Id.* at 1111. The approach that simply looks for state

exceptions to federal doctrine has been criticized as "incoherent." Landau, *State Constitutionalism*, 69 Rutgers U. L. Rev. 1324–25.

Even when federal caselaw may be used as guidance on the standing question, state courts have departed from federal standing doctrine in a number of important areas. For instance, a number of states have a "public interest" exception to their prudential standing requirements. *See, e.g., Sears v. Hull*, 961 P.2d 1013, 1019 (Ariz. 1998) (en banc) (finding an exception under state law to waive standing requirements for "issues of great public importance that are likely to recur"); *Higgins v. Hale*, 476 N.E.2d 95, 96 (Ind. 1985) (granting standing to a court of appeals case "[b]ecause the issues involved are of great public interest"); *Perella v. Mass. Tpk. Auth.*, 772 N.E.2d 70, 73 (Mass. App. Ct. 2002) (exploring Massachusetts law related to the invocation of public right doctrine in standing); *Narragansett Indian Tribe v. State*, 81 A.3d 1106, 1110 (R.I. 2014) ("On rare occasions . . . this Court will overlook the standing requirement by invoking the so-called 'substantial public interest' exception in order to decide the merits of a case of substantial public importance."); *ATC S., Inc. v. Charleston County*, 669 S.E.2d 337, 341 (S.C. 2008) ("In cases which fall within the ambit of important public interest, standing will be conferred 'without requiring the plaintiff to show he has an interest greater than other potential plaintiffs.'" (quoting *Davis v. Richland Cty. Council*, 642 S.E.2d 740, 742 (S.C. 2007))); *Gregory v. Shurtleff*, 299 P.3d 1098, 1102–03 (Utah 2013) ("While it is 'the usual rule that one must be personally adversely affected before he has standing to prosecute an action . . . it is also true this Court may grant standing where matters of great public interest and societal impact are concerned.'" (quoting *Jenkins v. State*, 585 P.2d 442, 443 (Utah 1978))); *Wash. Nat'l Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 459 P.2d 633, 635

(Wash. 1969) (finding exception when "a controversy is of serious public importance and immediately affects substantial segments of the population and its outcome will have a direct bearing on the commerce, finance, labor, industry or agriculture generally"); *see also* John Dimanno, *Beyond Taxpayers' Suits: Public Interest Standing in the States*, 41 Conn. L. Rev. 639, 640 (2008) (applying the federal standing requirements and states' public interest exception and finding that the public interest exception is "appropriate in state courts, given the significant differences in constitutional background, governance structures, and historical common law developments between federal and state judicial systems"). *But see* M. Ryan Harmanis, *States' Stances on Public Interest Standing*, 76 Ohio St. L.J. 729, 729 (2015) (analyzing generally the legal and policy rationales underlying states' rejection of federal standing doctrine in cases implicating the public interest exception, yet "concluding that its underlying rationales are insufficient to warrant bypassing standing's requirement of an actual injury").

Others allow broad taxpayer standing to challenge official action well beyond the confines of federal caselaw established in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 102 S. Ct. 752 (1982). *See, e.g., Chapman v. Bevilacqua*, 42 S.W.3d 378, 383 (Ark. 2001) (explaining that under Arkansas law, citizens must only be a citizen and taxpayer to have standing in public fund cases, noting also that interest for standing in like cases is to be given "a very broad construction"); *Reeder v. Wagner*, No. 435, 2008, 2009 WL 1525945, at *2 (Del. June 2, 2009) ("Even absent the showing of a particularized injury, however, this Court has recognized in certain cases that a plaintiff may have standing, as a taxpayer, to enjoin the unlawful expenditure of public money or the misuse of public property."); *McKee v. Likins*, 261

N.W.2d 566, 570 (Minn. 1977) (observing that "[i]n contrast with the Federal courts, it generally has been recognized that a state or local taxpayer has sufficient interest to challenge illegal expenditures"). *See generally* Joshua G. Urquhart, *Disfavored Constitution, Passive Virtues? Linking State Constitutional Fiscal Limitations and Permissive Taxpayer Standing Doctrines*, 81 Fordham L. Rev. 1263 (2012) (contrasting the state and federal approached regarding taxpayer standing, and expounding on the theories undergirding each approach).

In addition, states have not necessarily accepted the serpentine course of federal caselaw on standing. For instance, in the highly controversial case of *Lujan*, the majority of the Supreme Court announced a new and more restrictive approach to standing. 504 U.S. at 572–73, 112 S. Ct. at 2142–43. A number of state courts have rejected application of *Lujan* under their state constitutions. *See, e.g., City of Greenwood Vill. v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 437 n.8 (Colo. 2000) (en banc) (considering the narrowed standing requirements under *Lujan* and specifically finding that "[o]ur standing doctrine does not require these refinements"); *Andross v. Town of West Hartford*, 939 A.2d 1146, 1157–59 (Conn. 2008) (weighing federal and Connecticut caselaw on standing and ultimately resolving their rejection of federal norms in favor of more liberal state standards); *Citizens for Prot. of N. Kohala Coastline v. County of Hawai'i*, 979 P.2d 1120, 1127 (Haw. 1999) ("[Defendant's] reliance on *Lujan* . . . [is] misplaced, inasmuch as the United States Supreme Court's doctrine on the issue of standing does not bind us."); *Stockmeier v. Nev. Dep't of Corr. Psychological Review Panel*, 135 P.3d 220, 225–26 (Nev. 2006) (examining the *Lujan* approach, examining the history of state-crafted standing, and ultimately rejecting the *Lujan* approach under Nevada law), *abrogated on other grounds by Buzz Stew, LLC v. City of North*

*Las Vegas*, 181 P.3d 670, 672 n.6 (Nev. 2008); *Kellas v. Dep't of Corr.*, 145 P.3d 139, 143 (Or. 2006) ("[W]e cannot import federal law regarding justiciability into our analysis of the Oregon Constitution and rely on it to fabricate constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government."); *West v. Seattle Port Comm'n*, 380 P.3d 82, 86 (Wash. Ct. App. 2016) (finding the restrictive *Lujan* approach as fundamentally opposed to the broad Washington approach). Other state courts, however, have embraced the federal standing doctrine as articulated in *Lujan*. *See, e.g.*, *Blackmon v. Tenet Healthsys. Spalding, Inc.*, 667 S.E.2d 348, 350 n.6 (Ga. 2008) (adopting implicitly the *Lujan* approach to standing); *ABC Agra, LLC v. Critical Access Grp., Inc.*, 331 P.3d 523, 525 (Idaho 2014) (outlining the Idaho caselaw favoring the *Lujan* standing doctrine); *Plan Helena, Inc.*, 226 P.3d at 569 (likening the narrowness of federal justiciability under Article III to that found in article VII, section 4 of the Montana Constitution); *Moore v. Middletown*, 975 N.E.2d 977, 982 (Ohio 2012) (adopting *Lujan* outright regarding standing); *Cable v. Union Cty. Bd. of Cty. Comm'rs*, 769 N.W.2d 817, 825 (S.D. 2009) (adopting the *Lujan* standard for standing, and ultimately rejecting petitioner's claim on that basis). *See generally* Benjamin T. Sharp, *Stepping into the Breach: State Constitutions as a Vehicle for Advancing Rights-Based Climate Litigation*, 14 Duke J. Const. L. & Pub. Pol'y Sidebar 39, 46–52 (2019) (examining the federal standing doctrine as it relates to state constitutional claims for climate litigation).

At least three states, however, have engaged in wholesale reformulation of their standing requirements. In *Lansing Schools Educational Association*, the Michigan Supreme Court gave its standing doctrine an overhaul. 792 N.W.2d at 699–702. The Oregon Supreme Court did the same in *Couey*, 355 P.3d at 875–76. And finally, in *Kuhnlein*,

646 So. 2d 717, the Florida court reexamined its reliance on federal standing doctrine. *Id.* at 720.

More than fifteen years ago, Hans Linde noted that "many lawyers, judges, and academics assume that federal formulas for review of official actions equally apply to state law." Linde, *State and Federal Courts*, 46 Wm. & Mary L. Rev. at 1273. Parties appearing before our court have generally simply assumed that the federal caselaw on standing is applicable in Iowa notwithstanding the lack of "case" or "controversy" language in the Iowa Constitution.

Following the limited advocacy, our caselaw suggests that we look to federal cases for guidance as we consider, as a self-imposed prudential matter, whether to provide access to the courts to specific litigants. *See Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013) (characterizing standing as "[o]ur self-imposed standing inquiry"); *Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 869 (Iowa 2005) ("[T]he federal test for standing is based in part upon constitutional strictures and prudential considerations while our rule on standing is self-imposed."); *Hawkeye Bancorp. v. Iowa Coll. Aid Comm'n*, 360 N.W.2d 798, 802 (Iowa 1985) ("Unlike the federal courts, state courts are not bound by constitutional strictures on standing.").

Thus, our standing doctrine is not constitutionally based. In applying the prudential doctrine, we recognized a public interest exception to mootness and have at least indicated a willingness to consider a public interest exception generally to conventional standing doctrine. *Godfrey v. State*, 752 N.W.2d 413, 419–20 (Iowa 2008) (stating willingness to consider a public interest exception to standing requirements, generally); *Rush v. Ray*, 332 N.W.2d 325, 326 (Iowa 1983) (finding a public interest exception to the mootness doctrine). We have also allowed taxpayer standing more

broadly than would be the case under federal jurisprudence. *Godfrey*, 752 N.W.2d at 420–24, 429.

In sum, the question of whether Dickey has standing in this case to litigate his claim is a question of state law. Further, under state law, standing is a self-imposed prudential doctrine that does not have constitutional dimension. In the exercise of self-imposed prudential discretion, we may follow federal caselaw to the extent it is persuasive but are under no obligation to do so.

**B. Contours of Relevant Federal Jurisprudence Regarding Standing by Legislative Action.**

1. *Introduction.* This case involves the question of whether Dickey has standing as a result of legislative action in Iowa Code chapters 68A and 68B. The question arises: what role does legislative action have in determining whether a party has standing to litigate in court?

2. *Early recognition of congressional power to create causes of action brought by strangers.* Article III of the United States Constitution, as a textual matter, contains no reference to an injury-in-fact requirement, often cited in some recent federal cases as a requirement for standing. The notion of standing does not appear in Supreme Court cases until 1944 when the Court decided *Stark v. Wickard*, 321 U.S. 288, 306, 64 S. Ct. 559, 569 (1944). And the concept of "injury in fact" did not surface until around 1970. *See generally* Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 201 (1992) [hereinafter Sunstein, *After* Lujan] (finding the Supreme Court, in analysis of its own caselaw, suggested that injury in fact was a requirement under the Article III framework).

Scholars have noted that English practice prior to the United States Constitution allowed strangers to have standing in a number of cases.

*See, e.g., id.* at 171 ("In both England and America [from the founding until 1920], actions by strangers, or by citizens in general, were fully permissible and indeed familiar."). Further, early congressional action authorizing qui tam[5] and informer's actions[6] suggest that suits without personal injury by persons who were acting as representatives of others were not viewed as raising constitutional problems under Article III. *See id.* at 170–77. The congressional enactment of qui tam and informer's actions in the era of the constitutional adoption has been cited as demonstrating that Article III was not intended to limit congressional power to create a cause of action and remedies even on behalf of relative strangers to an event or transaction. *Id.* at 177.

3. *Legislative power to create citizen standing.* The Supreme Court has historically recognized the power of the legislature to authorized aggrieved parties to appeal from agency action. For instance, in *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 60 S. Ct. 693 (1940), the Supreme Court rejected the government's argument that the plaintiff did not have standing. There, the Court emphasized that "[i]t is within the power of Congress to confer such standing to prosecute an appeal." *Id.* at 477, 60 S. Ct. at 698.

Another example of legislative power to create causes of action with remedies for strangers is *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114 (1982). In *Havens Realty*, the Court noted that Congress declared it unlawful "[t]o represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for

---

[5]A qui tam action gives citizens a right to bring a civil suit to enforce federal criminal law. Sunstein, *After* Lujan, 91 Mich. L. Rev. at 175.

[6]An informer's action allowed a person to bring an action to enforce public duties. Sunstein, *After* Lujan, 91 Mich. L. Rev. at 175.

inspection, sale, or rental when such dwelling is in fact so available." 455 U.S. at 367 n.2, 102 S. Ct. at 1118 n.2 (quoting section 804 of the Fair Housing Act of 1968, 42 U.S.C. § 3604(d)). In *Havens Realty*, the Supreme Court held that Congress created the injury, namely, a "statutorily created right to truthful housing information." *Id.* at 374, 102 S. Ct. at 1122; *see also* Sunstein, *After* Lujan, 91 Mich. L. Rev. at 189–92.

These United States Supreme Court cases stand for the proposition that to the extent standing doctrine is based on prudential concerns, the legislative branch has the power to override them by statute. If we were to choose to follow these federal cases, since standing is entirely prudential in Iowa, the legislature may establish who has standing to litigate a particular cause of action it has established.

4. *Splintered departures in* Lujan. The Supreme Court in *Lujan* took the law of standing, in fits and starts, in a new direction. In *Lujan,* two members of Defenders of Wildlife asserted injury arising from EPA action announcing that the Endangered Species Act would only apply to actions in the United States or on the high seas. 504 U.S. at 557–59, 112 S. Ct. at 2135. One person swore she traveled to Egypt and viewed the habitat of the endangered Nile crocodile and intended to do so again. *Id.* at 563, 112 S. Ct. at 2138. Another person visited Sri Lanka in 1981 and observed the habitat of the Asian elephant and leopard. *Id.* at 563–64, 112 S. Ct. at 2138. The Supreme Court found that the plaintiffs lacked injury in fact as their plans to visit impacted areas were too indefinite to support injury in fact. *Id.* at 566–67, 112 S. Ct. at 2139–40. Further, the *Lujan* majority suggested that there was an "irreducible constitutional minimum" of standing elements: (1) injury in fact, (2) traceability, and (3) redressability. *Id.* at 560–61, 112 S. Ct. at 2136.

The development by the Supreme Court of a constitutionally based injury-in-fact requirement was foreshadowed by a 1983 article written by then-Judge Antonin Scalia. *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 881–82 (1983) (suggesting that "courts need to accord greater weight than they have in recent times to the traditional requirement that the plaintiff's alleged injury be a particularized one, which sets him apart from the citizenry at large"). The development of an injury-in-fact constitutional requirement has been highly contested, as demonstrated by the academic criticism[7] and the number of state courts that have declined to follow it.[8]

In a concurring opinion, however, Justice Kennedy noted that had the plaintiffs actually purchased an airplane ticket, had a specific date to visit, or used the sites on a regular basis, they might have had standing. *Lujan,* 504 U.S. at 579–80, 112 S. Ct. at 2146 (Kennedy, J., concurring in part and in the judgment). Importantly, Justice Kennedy emphasized that courts "must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition." *Id.* at 580, 112 S. Ct. at 2146. And, he emphasized that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.* According to Justice Kennedy,

---

[7]*See, e.g.*, F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275, 320–21 (2008) ("The Constitution charges Congress with enacting laws. The injury-in-fact requirement, however, restricts Congress's power to create rights . . . thus prevent[ing] Congress from exercising the full extent of its power to create rights."); Richard J. Pierce, Jr., Lujan v. Defenders of Wildlife: *Standing as a Judicially Imposed Limit on Legislative Power*, 42 Duke L.J. 1170, 1170–71 (1993) (stating that the majority opinion "is an insupportable judicial contraction of legislative power to make judicially enforceable policy decisions"); Sunstein, *After* Lujan, 91 Mich. L. Rev. at 217 (claiming that the opinion "reads Article III broadly, invests it with general, controversial values, and ultimately recommends judicial invalidation of the outcomes of democratic processes").

[8]See cases cited in division IIA above.

Congress failed to "identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring the suit." *Id.* at 580, 112 S. Ct. at 2147; *see* Sunstein, *After* Lujan, 91 Mich. L. Rev. at 201–02.

There was, obviously, some tension between the majority's reference to an "irreducible constitutional minimum," *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136 (majority opinion), and Justice Kennedy's opinion emphasizing the power of Congress to define injuries, *id.* at 580, 112 S. Ct. at 2146–47 (Kennedy, J., concurring in part and in the judgment). Certainly the notion that Congress had a role in determining who had standing to litigate was not foreclosed under the concurring opinion. *See Massachusetts v. EPA*, 549 U.S. 497, 516, 127 S. Ct. 1438, 1453 (2007) (stating congressional authorization is of "critical importance to the standing inquiry"); Mark Seidenfeld & Allie Akre, *Standing in the Wake of Statutes*, 57 Ariz. L. Rev. 745, 748 (2015) (finding Congress can "recognize interests and thereby influence judicial evaluation of whether an interest is sufficiently concrete and immediate to justify standing").

5. *Informational standing under* Akins. The United States Supreme Court considered an important standing issue in *Akins*. In *Akins*, voters attempted to convince the Federal Election Commission (FEC) to treat the American Israel Public Affairs Committee (AIPAC) as a political committee within the meaning of the Federal Election Campaign Act of 1971 (FECA). *Akins*, 524 U.S. at 13–14, 118 S. Ct. at 1780–81. The FEC came to the conclusion that AIPAC was not a political committee subject to regulation under the FECA. *Id.* at 18, 118 S. Ct. at 1783. The plaintiffs brought an action claiming they were statutorily entitled to challenge the action of the FEC. *Id.* The FEC asserted, among other things, that the voters lacked standing in their capacity as citizens and that the suit should be dismissed. *Id.*

In an important opinion by Justice Kennedy, the Supreme Court found sufficient injury in fact to conclude that the voters had standing. *Id.* at 20, 118 S. Ct. at 1784. The *Akins* Court first found that, because Congress had granted standing to "[a]ny party aggrieved," the prudential limits had been overcome. *Id.* at 19, 118 S. Ct. at 1783 (alteration in original) (quoting 2 U.S.C. § 437g, now found at 52 U.S.C. § 30109(a)(8)(A) (2018)). The Court then found injury in fact because the statute requires that information about AIPAC donors and campaign contributors be made public. *Id.* at 21, 118 S. Ct. at 1784. In the opinion of the Court, there was a nexus between voter standing and the statutory harm that was suffered—failure to disclose donor and expenditure information. *Id.* at 22, 118 S. Ct. at 1785. The *Akins* Court recognized that while prior decisions favored the political process for resolution of widely shared grievances, the availability of the political remedy "does not, by itself, automatically disqualify an interest for Article III purposes." *Id.* at 24, 118 S. Ct. at 1786. On the question of redressability, the *Akins* Court held that plaintiffs had standing to challenge a decision of the FEC based on improper legal grounds. *Id.*

The *Akins* case was examined shortly after it was decided by Professor Cass Sunstein, a leading constitutional scholar. Sunstein noted that in *Akins,* the Court rooted standing "firmly in Congress's instructions." Cass Sunstein, *Informational Regulation and Informational Standing:* Akins *and Beyond*, 147 U. Pa. L. Rev. 613, 637 (1999). The injury-in-fact requirement was satisfied, according to Sunstein, because the plaintiffs "were denied information to which they had a legal right." *Id.* at 638. In short, although labeled "injury in fact," the determination turns on what the law is: what does the law require to be made public? *Id.* Sunstein concluded that "at least where the plaintiff seeks information,

and where Congress has created a legal interest and a right to bring suit, the Constitution does not stand as an obstacle." *Id.* at 643.

6. *Post-*Akins *caselaw.* There are a handful of post-*Akins* cases that deal with the issue of standing to challenge an action by an administrative agency in the context of election law. Most of them are federal cases dealing with standing under Article III of the United States Constitution. There is one case, however, that considers the standing of a voter in the context of disclosure required pursuant to a state election disclosure statute. In *Common Cause v. FEC*, 108 F.3d 413 (D.C. Cir. 1997) (per curiam), a nonpartisan political organization sought review of an FEC action to dismiss a complaint concerning alleged violations of the federal campaign elections law. The gist of the claim was that the Montana Republican Party and the National Republican Senatorial Committee violated federal law by making contributions in excess of legal limits to a senatorial campaign and by failing to accurately report those contributions and expenditures. *Id.* at 415. Although the FEC voted 3–2 to find probable cause to believe violations occurred, four votes are requires to act under federal law. *Id.* As a result of the deadlock, the FEC voted to dismiss the matter. *Id.*

In a per curiam opinion, the court in *Common Cause* emphasized that Common Cause was "less than clear in articulating the nature of the information of which its members and the organization itself allegedly have been deprived." *Id.* at 417. The *Common Cause* court noted that *Akins* declared that "[a] voter deprived of useful information at the time he or she votes suffers a particularized injury" but characterized the *Common Cause* complaint as simply seeking disclosure to the public of the fact that a violation of federal law occurred. *Id.* at 418 (quoting *Akins v. FEC*, 101 F.3d 731, 737 (D.C. Cir. 1996), *vacated*, 524 U.S. 11, 118 S. Ct. 1777

(1998)). While Common Cause alleged that federal law provided that "any person" could file a complaint with the FEC and that "any person" aggrieved by an order could seek judicial review, the *Common Cause* court held that, notwithstanding the statutory provisions, Article III of the United States Constitution required more. *Id.* at 418. In support of their conclusion, the *Common Cause* court cited *Lujan* for the proposition that, notwithstanding the statutory provisions allowing a citizen to sue to enforce the law, Common Cause was required to show discrete injury flowing from the violation. *Id.* at 418–19.

A federal district court dealt with campaign finance matters in *Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138 (D.D.C. 2005). In *Alliance for Democracy*, the petitioners claimed that a political committee provided the John Ashcroft senatorial campaign with a valuable campaign list of 100,000 donors and that neither the political action committee nor the Ashcroft campaign reported the contribution. *Id.* at 139–40. After an investigation, the FEC entered into a conciliation agreement which concluded that the list was not a reportable contribution and did not require disclosure of its value. *Id.* at 141. Alliance for Democracy (AFD) sought to challenge the action of the FEC on appeal. *Id.* The district court conducted an Article III analysis and held that because AFD had already obtained the information it sought, it lacked standing to maintain the action. *Id.* at 148–49.

In *Mallof v. District of Columbia Board of Elections & Ethics*, 1 A.3d 383 (D.C. 2010), the District of Columbia Court of Appeals considered a case where plaintiffs challenged a determination of the Office of Campaign Finance that a candidate had not violated local campaign finance law by using government resources in a political campaign. *Id.* at 385. The gist of the claim was that the incumbent candidate for city council used

government resources by using his council office as a backdrop for photographs of himself and the uniformed chief of police that were used in a campaign advertisement. *Id.* at 387. After an investigation, the board elected to dismiss the action "because the photograph was not taken for a campaign-related purpose and because [the chief of police] consented to pose [with the councilman] in the photograph for a personal, not campaign-related purpose." *Id.* In administrative proceedings after the election, the board held that the plaintiffs lacked standing to raise their claims. *Id.* at 389–90.

On appeal, the *Mallof* court agreed. It focused its analysis on the "case" or "controversy" requirement of Article III of the United States Constitution. *Id.* at 395. According to the *Mallof* court, the plaintiffs merely sought a declaration that a violation of campaign finance law occurred, and such an allegation was insufficient under Article III. *Id.* at 399. The *Mallof* court emphasized that the plaintiffs were not seeking information of any kind and, as a result, *Akins* had no bearing on the case. *Id.* at 398–99.

Finally, in *Lindemann v. Commission on Governmental Ethics & Election Practices*, 961 A.2d 538 (Me. 2008), the Supreme Judicial Court of Maine considered a case in which the petitioner sought to appeal a ruling of the Maine Commission on Governmental Ethics and Election Practices. *Id.* at 540. The petitioner claimed that because of the involvement of the Maine Heritage Policy Center (MHPC) in a statewide campaign to enact a taxpayer bill of rights law (TABOR), MHPC was a political action committee under Maine campaign finance law, requiring MHPC to register and file reports with the commission. *Id.* In the alternative, the petitioner asserted that the MHPC was required to report its expenditures in support of TABOR under regulations related to efforts

to support or defeat ballot measures.  *Id.*  The commission found that the MHPC was not a political action committee, but was required to report its expenditures in support of the ballot initiative.  *Id.* at 541.  The report was filed within thirty days of the decision.  *Id.*

The *Lindemann* court noted that in Maine, standing is prudential rather than constitutional.  *Id.*  In considering the standing question, the *Lindemann* court noted that under the relevant Maine election finance statute, "Only a 'person aggrieved by the failure or refusal of the agency to act'" is entitled to judicial review.  *Id.* at 542 (quoting Me. Rev. Stat. tit. 5, § 11001(2) (2007)).  In this case, the *Lindemann* court noted the agency did act, and as a result, this statutory right did not kick in.  *Id.* at 542–43.

In the alternative, the *Lindemann* court held that the petitioner was not "aggrieved" in this case.  *Id.* at 543.  The *Lindemann* court noted that, as a matter of statutory interpretation, the term "aggrieved" party under the Maine Administrative Procedures Act (MAPA) had been interpreted by the court to require particularized injury, that an agency action or inaction must operate "prejudicially and directly upon the party's property, pecuniary or personal rights."  *Id.* at 543 (quoting *Nelson v. Bayroot, LLC,* 953 A.2d 378, 382 (Me. 2008)).  Under Maine statutory precedent, "[b]eing affected by a government action is insufficient to confer standing in the absence of any showing that the effect in an injury."  *Id.* (quoting *Collins v. State,* 750 A.2d 1257, 1260 (Me. 2000)).  As a result of its statutory interpretation of the term "aggrieved," the *Lindemann* court determined that the petitioner lacked standing in this case.  *Id.* at 544.

The *Lindemann* court briefly reviewed *Akins* and emphasized that unlike the FECA, Maine's campaign statutes do not expressly provide a right to judicial review.  *Id.*  In any event, the *Lindemann* court noted that unlike in *Akins,* the petitioner was not deprived of useful political

information. *Id.* at 545. Under the commission's alternate ruling, the petitioner received information sought on MHPC's financial involvement with TABOR. *Id.* As a result, the *Lindemann* court held that *Akins* did not apply. *Id.*

There were several important footnotes to the *Lindemann* opinion. First, in footnote 9, the *Lindemann* court emphasized other statutes afforded broader access to the courts than the MAPA. *Id.* at 543 n.9. Specifically, the court noted that under *Superintendent of Insurance v. Attorney General*, 568 A.2d 1197 (Me. 1989), the legislature provided that "a party did not need show particularized aggrievement in order to have standing pursuant to the Insurance Code statutes." *Lindemann*, 961 A.2d at 543 n.9. The *Lindemann* court emphasized that the Maine election finance statutes did not "include an independent or more expansive grant of standing." *Id.*

The legislature's prerogatives were further reinforced by the *Lindemann* court in footnote 11. There, the court noted that "[b]ecause standing in administrative appeals is statutorily based, whether standing to challenge a determination of the Commission should extend to the general public is a decision to be made by the legislature, not the judiciary." *Id.* at 545 n.11.

**C. Cases from Other State Jurisdictions Related to Legislatively Established (or Not) Causes of Action.** I now turn to caselaw in state jurisdictions dealing with the question of the power of the legislature to enact statutes that enable broad groups of persons to challenge administrative actions in the courts. As will be seen below, there is substantial authority in state courts for the proposition that the legislature has the power to establish causes of action that provide litigants with the right to litigate in the state courts without interference

or restrictions by a state court unhappy with the substance of the legislation.

By way of example, in *Housing Authority v. Pennsylvania State Civil Service Commission*, 730 A.2d 935 (Pa. 1999), the Pennsylvania Supreme Court considered an appeal by a county housing authority of a determination by the state civil service commission that the appointment of an applicant as executive director violated Pennsylvania's Veterans' Preference Act. *Id.* at 937. In considering standing issues in the case, the Pennsylvania Supreme Court noted that the drafters of the Pennsylvania Constitution did not restrict the courts to jurisdiction in matters involving a "case" or "controversy." *Id.* at 941. According to the Pennsylvania Supreme Court,

> if a statute properly enacted by the Pennsylvania legislature furnishes the authority for a party to proceed in Pennsylvania's courts, the fact that the party lacks standing under traditional notions of our jurisprudence will not be deemed a bar to an exercise of this Court's jurisdiction . . . .
>
> . . . [T]he Pennsylvania legislature may vest a governmental agency like the Commission with the authority to enforce the veterans' preference provisions . . . regardless of whether the Commission itself has suffered any cognizable injury which would afford it standing under our jurisprudence.

*Id.* Similarly, in *Lansing Schools Education Association*, the Michigan Supreme Court considered whether teachers could bring a cause of action under a statute against a schoolboard for failing to comply with its statutory duty to expel students that have allegedly physically assaulted those teachers. 792 N.W.2d at 688. The district court granted a motion for summary judgment on the ground the plaintiffs lacked standing to litigate. *Id.* at 689.

In reversing and remanding the case, the Michigan Supreme Court employed its "long-standing historical approach to standing." *Id.* at 699. According to the Michigan Supreme Court, "[u]nder this approach, a litigant has standing whenever there is a legal cause of action." *Id.* The Michigan Supreme Court further noted that standing may be conferred "if the statutory scheme implies that the Legislature intended to confer standing on the litigant." *Id.*

Another case emphasizing the role of the legislature in creating enforceable causes of action is *Small v. Federal National Mortgage Ass'n*, 747 S.E.2d 817 (Va. 2013). In *Small*, the Virginia Supreme Court answered certified questions regarding the authority of a clerk of court to initiate litigation related to the enforcement of a real estate transfer tax. *Id.* at 819–20. The Virginia Supreme Court declared that the question was not whether the plaintiff had a personal stake in the controversy or whether the plaintiff's rights would be affected, but rather whether "the plaintiff . . . possess[es] the 'legal right' to bring the action, which depends on the provisions of the relevant statute." *Id.* at 820. The *Small* court cited Virginia precedent involving procurement, noting that it had "examined those statutes to determine whether the plaintiffs had standing" to litigate their claims. *Id.* at 821. After canvassing the relevant statutes, the Virginia Supreme Court concluded that the clerk lacked the authority to litigate under the applicable statutes. *Id.* at 824; *see* Zachary D. Clopton, *Procedural Retrenchment and the States*, 106 Calif. L. Rev. 411, 425 n.210 (2018) (noting that many states recognize statutorily created standing).

**D. Relevant Iowa Caselaw.** In older cases under the IAPA, we indicated that in determining the meaning of the term "aggrieved," a party must show "(1) a specific personal and legal interest in the subject matter" and "(2) a specific and injurious effect on this interest by the decision."

*Iowa Power & Light Co. v. Iowa State Commerce Comm'n*, 410 N.W.2d 236, 239 (Iowa 1987) (quoting *Iowa-Ill. Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 347 N.W.2d 423, 426 (Iowa 1984)); *see also Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439, 443 (Iowa 1983).

In *Godfrey,* however, we altered the first prong of the test to require only a specific personal *or* legal interest in the subject matter. 752 N.W.2d 418–19. Thus, under our current law, a party may satisfy the standing test by showing a "legal interest" in the subject matter of the litigation and demonstrating the challenged decision has a specific and injurious effect on that "legal interest."

In our caselaw, we did not permit the federal zone-of-interest test articulated in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S. Ct. 827, 830 (1970), to limit standing in challenges to agency action. *See Iowa Bankers Ass'n,* 335 N.W.2d at 442–44. Nothing in *Iowa Bankers*, however, undermines the proposition that determination of the scope of "legal interest" created by the statute allegedly violated by an administrative agency is critical in determining whether a legal interest has been violated and if that legal interest has been injured.

Finally, as noted above and is briefly reprised here, our standing doctrine is not constitutionally imposed but is prudential in nature. *See, e.g., Horsfield Materials, Inc.*, 834 N.W.2d at 452 (describing Iowa standing requirements as "self-imposed"). As a result, the question of who is aggrieved under the IAPA is purely a question of statutory interpretation.

### III. Discussion.

Based on my review of the above authorities, I am convinced that the sole question before us today is whether the legislature provided Dickey with a substantive "legal interest" under Iowa Code chapters 68A

and 68B. Such a legal interest would support a right to bring an enforcement action under the IAPA to require the Board to insist that political committees submit accurate information for public disclosure. The scope of the statutory legal interest, if any, is determined by looking at whether the legislature has provided Dickey with a legal interest supporting the claim he seeks to pursue in this case. If so, he has standing to bring the claim. If not, he is not entitled to relief as he has not alleged a common law or constitutional claim.

This approach is consistent with the state court cases cited above, considering whether citizens have standing to enforce various statutory provisions. In these cases, the key question is whether the legislature provided the plaintiff with a substantive legal right to the relief sought, and, if so, whether there is sufficient "injury in fact" to bring the action when that right has been threatened by administrative action. *See, e.g.*, *Lansing Schools*, 792 N.W.2d at 733; *Housing Auth.*, 730 A.2d at 941; *Small*, 747 S.E.2d at 820.

This basic principle is illustrated by the Iowa Public Records Act. Iowa Code ch. 22. Under chapter 22, "[a]ny aggrieved person, any taxpayer to or citizen of the state of Iowa . . . may seek judicial enforcement of the requirements of this chapter . . . ." Iowa Code § 22.10(1). The legislature has thus made it abundantly clear that any citizen may bring an action without any injury other than the injury that arises from the violation of the citizen's substantive right to inspect and copy a public record. *Id.* A plaintiff bringing an action under chapter 22, as evidenced by the broad standing language included in section 22.10(1) and the lack of additional requirements, may have a good reason or no reason at all for requesting the disclosure, and therefore may even already know the information contained in the public document. The key is that the legislature has

provided a substantive legal interest in the inspection and production of public documents, and as a result, an injury to that legal interest occurs whenever a custodian wrongfully withholds the documents. The legal interest of the citizen under chapter 22 is in *public disclosure* and not information for personal use.

In my view, the legislature, in enacting the provisions of chapters 68A and 68B related to campaign finance created a *disclosure* statute like Iowa Code section 22.10(1). The legislature created an Iowa Ethics and Campaign *Disclosure* Board. *See id.* § 68B.32(1). The legislature directed the Iowa Ethics and Campaign Disclosure Board to review content and verify information in the reports of campaign committees "to assure accurate disclosure." *Id.* § 68B.32A(4). Further, the legislature directed the Iowa Ethics and Campaign Disclosure Board to assure that statements and reports filed in accordance with this chapter "are available for public inspection." *Id.* § 68B.32A(7).

The substantive disclosure requirements are provided in Iowa Code chapter 68A and include disclosure of expenditures and campaign contributions. *See generally id.* § 68A.402A (outlining the information to be disclosed in campaign finance reports). The legislature has provided that "[a] committee receiving an in-kind contribution shall report the estimated fair market value of the in-kind contribution." *Id.* § 68.402A.1(d). The language of the statutes demonstrate that the purpose of Iowa Code chapters 68A and 68B is public disclosure of accurate campaign finance information.

The legislature provided in Iowa Code section 68B.32B that "[a]ny person may file a complaint alleging . . . a violation of [the public disclosure requirements]." *Id.* § 68B.32B(1). The fact that the legislature allowed "any person" to file a complaint suggests that "any person" has been

broadly vested with a "legal interest" in accurate campaign finance disclosure. After a person files a complaint, the Board reviews such complaint under procedures outlined in the statute. *Id.* § 68B.32B(2)–(11). Judicial review of the actions of the Board may then be sought in accordance with chapter 17A. *Id.* at § 68B.33. If Dickey has a "legal interest" in the disclosure he seeks, he is "aggrieved" under Iowa Code section 17A.19(1) by the unfavorable action of the Board.

The question then becomes whether the provisions of Iowa Code chapters 68A and 68B provide for "any person" a legal interest in public disclosure of information related to expenditures and contributions. The principle that the legislature may establish standing to bring a claim was critical to the *Akins* decision. In *Akins,* Congress expressly declared that a person whose complaint was dismissed by the FEC was entitled to seek judicial enforcement. *Akins,* 524 U.S. at 19–21, 118 S. Ct. at 1783–84. As Justice Kennedy noted in his concurrence in *Lujan,* the courts "must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition." 504 U.S. at 580, 112 S. Ct. at 2146. And, Justice Kennedy noted that the legislative branch may "identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." *Id.* at 580, 112 S. Ct. at 2147.

The notion that the legislative branch may establish a cause of action and vest members of the public with standing to litigate has substantial support in the academic commentary. *See, e.g.,* Richard J. Pierce, Jr., Lujan v. Defenders of Wildlife: *Standing as a Judicially Imposed Limit on Legislative Power,* 42 Duke L.J. 1170, 1181, 1192, 1201 (1993) (observing that Congress has the power to confer standing legislatively and that the courts should enforce the legislature's policy decisions against state agencies); Cass R. Sunstein, *Standing and the Privatization of Public*

*Law*, 88 Colum. L. Rev. 1432, 1433 (1988) (suggesting that the "principal question [for standing] should be whether Congress has created a cause of action"). As noted by Professor Chayes many years ago, "the legitimacy of judicial action can be understood to rest on the delegation from the people's representatives." Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L. Rev. 1281, 1314 (1976).

Note the critical difference between this case and *Lindemann.* In *Lindemann*, the statute made no mention at all of a right to seek enforcement. But Dickey's position is stronger than in *Lindemann.* Iowa Code section 68B.33 expressly authorizes Dickey to file his complaint with the Board. Iowa Code § 68B.32B(1). It then goes on to state that "aggrieved" persons may bring challenges to Board action under the Iowa Administrative Procedures Act. So, as stated in footnotes 9 and 11 in *Lindemann*, the question is: what substantive legal rights did the legislature intend to bestow on Dickey? Unlike in *Lindemann*, it is clear that the Iowa legislature provided a substantive right of some kind to be enforced in the Iowa courts. The question then becomes: what is the scope of that legal right that Dickey may enforce?

The majority, in essence, declares that Dickey may have a legal right to force accurate disclosure of the names of contributors to a political committee but does not have a substantive right to require accurate disclosure in the *amount* of the contribution when he has a pretty good idea of the actual cost of a private jet to ferry the Governor and others to the Liberty Bowl.

But there is nothing in the Iowa campaign finance disclosure statutes that makes that distinction. The campaign finance disclosure statutes require that political committees accurately and publically disclose the names of their contributors and that they accurately and

publicly disclose the amount of the contribution. Dickey has a statutory legal right to complain to the Board about inaccurate disclosures in public reports of any kind, not just the failure to list campaign contributors. His statutory legal interest established by the statute is not solely in informing himself, but in requiring accurate public disclosure for all to see. And, if he is aggrieved by the action of the Board, he has the right to an appeal under the IAPA.

The question then is whether he is aggrieved when he has filed a complaint with the Board seeking an accurate public disclosure of the costs of the Memphis trip. First, the majority suggests that his grievance is too general to give rise to standing under Iowa Code section 17A.19(1). *See Godfrey*, 752 N.W.2d at 423–24. But as noted in *Akins*, the term "aggrieved" in the Federal APA suggests an intent to "cast the standing net broadly." 524 U.S. at 19–20, 118 S. Ct. at 1783. Further, as *Akins* states, a harm can be concrete even though widely shared. *Id.* at 24, 118 S. Ct. at 1786. The *Akins* Court further observed that an informational injury related to voting, the most basic of political rights, is sufficiently concrete to allow a party to litigate the issue. *Id.* at 24–25, 118 S. Ct. at 1786.

The *Akins* Court, in rejecting the prudential standing challenge, noted that, like here, the legislature had "specifically provided . . . that '[a]ny person who believes a violation of this Act . . . has occurred, may file a complaint with the Commission.' " *Id.* at 19, 118 S. Ct. at 1783 (quoting 2 U.S.C. § 437g, now found at 52 U.S.C. § 30109 (a)(8)(A)). Like *Akins*, this case does not merely involve "harm to the 'common concern for obedience to law.' " *Id.* at 23, 118 S. Ct. at 1785 (quoting *L. Singer & Sons v. Union Pac. R.R.*, 311 U.S. 295, 303, 61 S. Ct. 254, 258 (1940)). The harm of inaccurate public disclosure alleged in this case, like the harm in *Akins*, "is sufficiently concrete and specific such that the fact that it is

widely shared does not deprive [the legislature] of constitutional power to authorize its vindication in . . . courts." *Id.* at 25, 118 S. Ct. at 1786.

Under the reasoning of *Akins*, Dickey has been aggrieved by the denial of a statutory legal right established in Iowa Code chapters 68A and 68B. In my view, the substantive statutory legal right is broad enough to include not only a right to enforce disclosure of the names of donors, as in *Akins*, but also the right to force accurate public disclosure of amounts of the donation. Where the legislature establishes a broadly applicable legal right and provides that any person can seek enforcement before the Board, a person is aggrieved under Iowa Code section 17A.19(1) when the Board denies the party the relief sought.

The majority, however, interprets the statute more narrowly, suggesting that the statute provides Dickey only with the substantive statutory legal right to enforce it to obtain information that he does not already possess. Under the majority opinion, there is no right to force public disclosure, but only a personal right to obtain information. But public disclosure, and not personal disclosure, is at the very core of Iowa Code chapters 68A and 68B. There is little public interest in disclosure to Dickey himself, but substantial public interest in disclosure to the public generally.

Of course, the legislature could have employed more specific language in chapter 68B. It could have said, for instance, that any complainant denied relief by the Board is an aggrieved party under the IAPA. Or, it could have said more clearly that any citizen could bring an action to force accurate public disclosure of both the names of contributors and the amounts of contributions.

I thus concede that the scope of the legal right created by the legislature when it enacted Iowa Code chapters 68A and 68B is not entirely

clear. Of course, the legal right may be express, or it may be implied. *See Lansing*, 792 N.W.2d at 699. In my view, there is adequate indication that the legal right should be interpreted broadly enough to encompass Dickey's complaint.

What is crystal clear, however, is that nothing in the majority opinion should be read as defeating the general proposition that the Iowa legislature has the plenary power to create substantive legal interest that citizens are generally entitled to enforce in the event the established legal right is not recognized by an administrative agency. The legislature has the right to create statutory causes of action that can be enforced by citizens generally. Any "prudential" considerations must give way to the legislature's directive. When it enacts statutes that create statutory rights and enforcement mechanisms, the legislature holds the keys to the courthouse door that cannot be boarded up by the judiciary.

## IV. Conclusion.

For the above reasons, I conclude that the district court erred in concluding that Dickey lacked standing to litigate in this case. I take no view, of course, on the underlying merits of his claim. As the Board correctly asserts, if Dickey has standing in this case, the legal merit of his claim should be determined by the district court in the first instance.